UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                CRIMINAL ACTION

VERSUS                                  NO. 04-17

JOSEPH SMITH                            SECTION "C"

## **OPINION**

I.    **BACKGROUND**
      a    **The AAMR/AAIDD & DSM-IV-TR Definitions of Mental Retardation**
      b.   **The Expert Witnesses**

II.   **ANALYSIS**
      a.   **Factor One: Significantly Subaverage Intellectual Functioning**
           1.   Smith's IQ Scores
           2.   Criticism of IQ Scores by Dr. Hayes
                i.    *Malingering and Bias*
                ii.   *Other Testimony*
           3.   The Court's Finding re: Smith's Intellectual Functioning

      b.   **Factor Two: Significant Limitations in Adaptive Functioning**
           1.   Retrospective Diagnosis
           2.   Clinical Judgment in Adaptive Functioning Assessment
           3.   Dr. Swanson's Adaptive Functioning Assessment
                i.    *Adaptive Probes*
                ii.   *VABS-II and ABAS-II Scores*
                iii.  *Questions re: Dora Smith's Credibility*
                iv.   *Criticism of Dr. Swanson's VABS-II and ABAS-II Scores*
                      A.    Norming
                      B.    Bias and Inconsistent Answers
           4.   Dr. Hayes' s Adaptive Functioning Assessment
                i     *Discipline Issues Unrelated to Mental Deficits*
                ii.   *Clinical Interview*
                iii.  *Use of Correctional Officers as Respondents*
                iv.   *Drug Use and Brain Injury/Truancy*
           5.   School, Job Corps, U. S. Navy and Employment Records
                i.    *Elementary and High School*
                ii.   *Job Corps*
                iii.  *U.S. Navy*
                iv.   *Employment History*
           6.   The Court's Finding re: Smith's Adaptive Functioning

      c.   **Factor Three: Age of Onset**

III.    **CONCLUSION**

**APPENDIX A**
Additional Findings re: Dr. Swanson's Adaptive Behavior Assessment

**APPENDIX B**
Additional Examples re: Dr. Hayes' Interview

**APPENDIX C**
Additional Findings re: Dr. Hayes' Adaptive Behavior Assessment

This matter comes before the Court on pre-trial determination whether the defendant, Joseph Smith ("Smith") is mentally retarded for purposes of *Atkins v. Virginia*, 536 U.S. 304 (2002) and the Federal Death Penalty Act, 18 U.S.C. § 3596(c ).[1]   An evidentiary hearing was held on June 7-10, 2010, and the matter was taken under advisement.  Having thoroughly considered the record, the evidence and testimony adduced at trial, and the law, the Court now issues its opinion.

## I. BACKGROUND

Smith faces four counts contained in the Second Superseding Indictment pertaining to his role in a 2004 attempted bank robbery and death of a bank security officer.[2]   Two of those counts are capital.[3]   Smith asserts that he is mentally retarded and is therefore ineligible for the death penalty under *Atkins* and § 3596(c).   This issue will be determined before trial by the Court without a jury.

---

[1]Section 3596(c) provides in relevant part: "A sentence of death shall not be carried out upon a person who is mentally retarded."

[2]Rec. Doc. 157.

[3]Rec. Doc. 161.

2

Smith has the burden of proof by a preponderance of the evidence.

> **a.    The AAMR/AAIDD & DSM-IV-TR Definitions of Mental Retardation**

Mental retardation is a developmental disability, the definition of which the Court derives from the two sources recognized by the Supreme Court in *Atkins*: The American Association on Mental Retardation ("AAMR"), now known as the American Association on Intellectual and Developmental Disabilities ("AAIDD"), as of January 1, 2007, and the American Psychiatric Association ("APA").  At the time of the hearing, Smith was 59 years old.

Because the timing of the various expert evaluations, opinions and the hearing involving this defendant spanned the transition between two versions of the relevant AAMR/AAIDD definitions from two sequential manuals, the Court's analysis will involves both.   The AAMR defines mental retardation in the 10th edition of its standard reference work as follows:

> Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.  This disability originates before age 18.

MENTAL RETARDATION DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 1 (2002) ("AAMR 10TH EDITION").[4]    In 2007, ROBERT L. SCHALOCK, ET AL,

---

[4]The AAMR definition is accompanied by five assumptions:

1. Limitations in present functioning must be considered within the context of community environments typical of the individual's age peers and culture.
2. Valid assessment considers cultural and linguistic diversity as well as differences in communication, sensory, motor and behavioral factors.

USER'S GUIDE: MENTAL RETARDATION DEFINITION, CLASSIFICATION AND SYSTEMS OF SUPPORTS—10TH EDITION 18  (AAIDD 2007) ("USER'S GUIDE") was published for use in conjunction with the AAMR 10TH EDITION, pertaining to "the condition currently referred to as mental retardation (MR) or intellectual disabilities (ID)" and with the advice that "throughout the User's Guide, both mental retardation (MR) and intellectual disabilities (ID) will be used to reflect the national and international use of these terms."   As of the time of the hearing in June 2010, the AAIDD had published the most recent manual, INTELLECTUAL DISABILITY DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORT, 51–52 (2010)("AAIDD 11TH EDITION").   For purposes of completion, that definition provides:

> Intellectual disability is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.  This disability originates before age 18.[5]

Because the Supreme Court issued its decision in *Atkins* prior to the most recent publication and change of terminology by the AAIDD, the Court will use the term

---

3. Within an individual, limitations often coexist with strengths.
4. An important purpose of describing limitations is to develop a profile of needed supports.
5. With appropriate personalized supports over a sustained period, the life functioning of the person with mental retardation generally will improve.

AAMR 10TH EDITION at 13; USER'S GUIDE at 3.  The AAIDD 11TH EDITION's includes the same five assumptions, with the term "intellectual disability" substituted for the term "mental retardation" in the last assumption.

[5]AAIDD 11TH EDITION at 1.

"mental retardation" throughout this opinion when referring to the term intellectual disability as used in the AAIDD 11ᵀᴴ EDITION.

The definition and diagnostic criteria for mental retardation of the APA is contained in its standard reference work, the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, FOURTH EDITION TEXT REVISION (2000) ("DSM-IV-TR").  It provides in relevant part that a diagnosis of mental retardation requires:

A. Significantly subaverage intellectual functioning: an IQ of approximately 70 or below on an individually administered IQ test (for infants, a clinical judgment of significantly subaverage intellectual functioning).

B. Concurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in at least two of the following areas: communication, self-care, home living. Social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety.

C. The onset is before age 18 years.[6]

The DSM-IV-TR categorizes mental retardation as mild, moderate, severe, and profound, with a residual category of "mental retardation, severity unspecified."[7]  Mild Mental Retardation is associated with an IQ of 50–55 to 70–75,[8] and the DSM-IV-TR further describes it as follows:

---

[6]DSM-IV-TR at 49.

[7]*Id.* at 42–44.

[8]According to the DSM-IV-TR:
Borderline Intellectual Functioning describes an IQ range that is higher than that for Mental Retardation (generally 71–84). . . . [A]n IQ

> Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable." This group constitutes the largest segment (about 85%) of those with the disorder. As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0–5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age. By their late teens, they can acquire academic skills up to approximately the sixth-grade level. During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.

DSM-IV-TR at 43.

The American Psychological Association's Division of Mental Retardation and Developmental Disabilities ("Division 33") echoes this point and further elaborates:

> People classified with mild MR evidence small delays in the preschool years but often are not identified until after school entry, when assessment is undertaken following academic failure or emergence of behavior problems. Modest expressive language delays are evident during early primary school years, with the use of 2- to 3-word sentences common. During the later primary school years, these children develop considerable expressive speaking skills, engage with peers in spontaneous interactive play, and can be guided into play with larger groups. During middle school, they develop complex sentence structure, and their speech is clearly intelligible. The ability

---

> score may involve a measurement error of approximately 5 points, depending on the testing instrument. Thus, it is possible to diagnose Mental Retardation in individuals with IQ scores between 71 and 75 if they have significant deficits in adaptive behavior that meet the criteria for Mental Retardation. Differentiating Mild Mental Retardation from Borderline Intellectual Functioning requires careful consideration of all available information.

*Id.* at 48.

> to use simple number concepts is also present, but practical understanding of the use of money may be limited.  By adolescence, normal language fluency may be evident.  Reading and number skills will range from 1st- to 6th- grade level, and social interests, community activities, and self-direction will be typical of peers, albeit as affected by pragmatic academic skill attainment.  Baroff (1986) ascribed a mental age range of 8 to 11 years to adults in this group. This designation implies variation in academic skills, and for a large proportion of these adults, persistent low academic skill attainment limits their vocational opportunities.  However, these people are generally able to fulfill all expected adult roles.  Consequently, their involvement in adult services and participation in therapeutic activities following completion of educational preparation is relatively uncommon, is often time-limited or periodic, and may be associated with issues of adjustment or disability conditions not closely related to MR.

AM. PSYCHOL. ASS'N, MANUAL OF DIAGNOSIS AND PROFESSIONAL PRACTICE IN MENTAL RETARDATION 17–18 (John W. Jacobson & James A. Mulick eds., 1996)[hereinafter APA MANUAL].

The Supreme Court in *Atkins* recognized that the two "official" definitions of mental retardation are similar, but left to states the "task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences."  *Atkins,* 536 U.S. at 317.  In doing so, it noted that:

> [C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18.  Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial.  Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others.  There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are

7

followers rather than leaders.  Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Atkins*, 536 U.S. at 318.

The AAIDD recognizes that, with regard to persons with mental retardation or intellectual disabilities in the criminal justice system,

some criminal defendants fall at the upper end of the MR/ID severity continuum (i.e. people with mental retardation who have a higher IQ) and [they] frequently present a mixed competence profile.[9]  They typically have a history of academic failure and marginal social and vocational skills.  Their previous and current situations frequently allowed formal assessment to be avoided or led to assessment that was less than optimal.[10]

According to the AAIDD 11TH EDITION,[11] the higher IQ mentally retarded are also "more likely to mask their deficits and attempt to look more able and typical than they actually are."  Moreover, "persons with ID typically have a strong acquiescence bias or a bias to please that might lead to erroneous patterns of responding."[12]

---

[9]As this Court previously noted, "[m]ost individuals with mental retardation who commit criminal acts display mild mental retardation."  *United States v. Hardy*, 762 F.Supp.2d 849, 854 (E.D.La. 2010) (quoting J.G. Olley & A.W. Cox, *Assessment of Adaptive Behavior in Adult Forensic Cases: The Use of the Adaptive Behavior Assessment Systems-II*, *in* ADAPTIVE BEHAVIOR ASSESSMENT SYSTEM: ASSESSMENT AND APPLICATIONS FOR PROFESSIONAL AND PARAPROFESSIONAL PRACTICE 381, 383 (P.L. Harrison & T. Oakland 2008)).

[10]USER'S GUIDE at 18 (citations omitted).

[11]AAIDD 11TH EDITION at 51-52.  The fundamental principles relevant here are present in both editions and both terms, so the Court will try to cite to both, while recognizing the Supreme Court's reference to "mental retardation" in *Atkins*.

[12]*Id.* at 52.

###### b.     The Expert Witnesses

This is the Court's second *Atkins* determination.  The first case involved expert testimony from three of the four psychologists who testified at the hearing in this matter.[13]   *Hardy,* 762 F.Supp.2d at 855-56.

The only expert not to testify at the *Hardy* hearing, Marc L. Zimmerman, Ph.D., was the first to testify at this hearing and was accepted by the Court as an expert in the field of psychology without objection from the government.[14] According to his curriculum vitae, he received his bachelor's degree in psychology from North Texas State University, a master's degree in education from Out Lady of the Lake University,  master's and doctorate degrees in psychology from Texas A & M University - Commerce, and a masters degree in clinical psychopharmacology from the California School of Professional Psychology.[15] He received his Texas license in 1978 and his Louisiana license in 1979.[16] According to his testimony, he has administered "[h]undreds, if not thousands" of WAIS IQ tests during his career.[17]

---

[13]As to those three witnesses, the parties here stipulated to the inclusion herein of certain testimony from the *Hardy* hearing, a transcribed copy of which is stored with the exhibits from this hearing.  Rec. Docs. 1530, 1536.  Included in that stipulated testimony was testimony as to the respective qualifications of the three experts.  Rec. Docs. 1530, 1536.

[14]Rec. Doc. 1583 at 15.

[15]Deft. Exh. 3.

[16]*Id.*

[17]Rec. Doc. 1583 at 14-15.

The other three experts were recognized by the Court in *Hardy* as experts in psychology, although their varied professional experience with the mentally retarded was also discussed.   The second expert, Victoria Swanson, Ph.D., was called by the defendants at both hearings.   According to stipulated testimony,  Dr. Swanson is a licensed psychologist who was accepted by the Court without objection as an expert in mental retardation.  She has specialized in the field of mental retardation and developmental disabilities throughout her 35 year career. She received her bachelor's degree in psychology from the University of Southwestern Louisiana in 1973 and then began working with the intellectually disabled in rural Louisiana.  Dr. Swanson received her master's degree from Northwestern State University in 1991, writing her thesis on the Vineland test, a test of adaptive behavior.  She has continued her work in the area of mental retardation and received a doctorate degree in psychology in 1999 from Louisiana State University.  She is licensed in Louisiana.

According to stipulated testimony, Dr. Swanson has either performed or supervised approximately 6,000 assessments for mental retardation, and has administered approximately 300 IQ tests a year, and estimated her career total number of Vineland tests of adaptive behavior "in the 10,000s."[18]  She estimated that less than one percent of those assessments related to litigation in court, less than that related to an *Atkins* determination and that she estimated that she has

_____

[18]Rec. Doc. 1530, att., tab 2 at 586-87; Rec. Doc. 1536.

given opinions with regard to approximately 18 *Atkins* hearings.[19]   Numerous awards and distinctions from the AAMR and AAIDD are included on her curriculum vitae, and she has served as the President of the National Psychology Division of the AAMR.[20]   As an expert in mental retardation, she does not work primarily in the forensic field.[21]

The third psychologist who testified, Jill S. Hayes, Ph.D., was called by the government at both hearings.[22]   She was accepted without objection at this hearing as an expert in forensic psychology as well as mental retardation.[23]   According to stipulated testimony, Dr. Hayes received a bachelor's degree in psychology from Armstrong State College in 1990, a master's degree in applied psychology from Augusta State College in 1992, a master's degree in clinical psychology from Louisiana State University in 1995 and a doctorate degree in clinical psychology with a specialty in neuropsychology and a minor in behavioral neurology from

---

[19]Rec. Doc. 1530, att., tab 2 at 596; Rec. Doc. 1536; Rec. Doc. 1583 at 227.

[20]*See also* Deft. Exh. 1.

[21]Rec. Doc. 1583 at 190.

[22]At this hearing, Dr. Hayes' report was co-authored by John W. Thompson, Jr., M.D., who did not testify and who was not otherwise qualified as an expert. Dr. Thompson was also present at the videotaped interview of Smith.  Govt. Exh. 42; Rec. Doc. 1584 at 405.

[23]Rec. Doc. 1584 at 404.  As indicated in the stipulated testimony from the *Hardy* hearing, the Court accepted Dr. Hayes as an expert in the area of mental retardation based on her publications, education, teaching and court experience over the defendant's objection at the *Hardy* hearing.  Rec. Doc. 1530, tab 3 at 981-82; Rec. Doc. 1536. It considered the defense objection as relevant to the weight to be given her testimony regarding mental retardation, not its admissibility.  *Hardy*, 762 F.Supp.2d at 856.

Louisiana State University in 1998.  She did a one-year internship at the Medical University of South Carolina in 1997-1998, followed by a one-year fellowship at Louisiana State University Health Sciences Center in 1998-1999.   She is licensed in Louisiana as a neuropsychologist and clinical psychologist, and is licensed as a clinical psychologist in Arizona.

Dr. Hayes's stipulated testimony indicates that she has performed about 20 mental retardation assessments and ten Vineland tests since receiving her license in 1998.  She identified at least five articles authored by her that involved some aspect of mental retardation, three of which concerned malingering, at the *Hardy* hearing.[24]

The last psychologist, Mark D. Cunningham, Ph.D., was called by the defendant and accepted by the Court as an expert in forensic and clinical psychology at the *Hardy* hearing and as an expert in forensic psychology and mental retardation evaluation at this hearing without objection.[25]   According to stipulated testimony, Dr. Cunningham received his bachelor's degree in psychology from Abilene Christian College in 1973.   He received his master's and doctorate degrees in clinical psychology from Oklahoma State University in 1976 and 1977, respectively.  He had a clinical internship at the National Naval Medical Center in 1977-1978, and participated in part-time post doctoral training at Yale University School of Medicine between 1979 and 1981.  He is licensed in sixteen

---

[24]*See also* Govt. Exh. 42.

[25]Rec. Doc. 1585 at 596.

states including Louisiana, and he is board certified in clinical psychology and forensic psychology by the American Board of Professional Psychology.

Dr. Cunningham testified that he has performed many mental retardation assessments in a forensic context, including determinations of competency to stand trial, social security eligibility and for *Atkins* purposes, including testifying in *Atkins* hearings once or twice.[26]   He has co-authored papers on mental retardation issues in capital cases and has testified in federal capital cases.[27]

## II.  ANALYSIS

As previously indicated, the Court is guided by the diagnostic criteria for mental retardation developed by the APA and AAMR/AAIDD.  Those criteria contain three essential factors: significantly subaverage intellectual functioning, significant limitations in adaptive behavior, and onset prior to age 18.  Each will be separately discussed.

### a.    Factor One: Significantly Subaverage Intellectual Functioning

Intelligence is defined as "a general mental ability."[28]   "It includes reasoning, planning, solving problems, thinking abstractly, comprehending complex ideas, learning quickly, and learning from experience."[29]   The determination of intellectual functioning and significant limitations is assessed by

---

[26]*Id.* 1585 at 708.

[27]*See also* Deft. Exh. 11.

[28]AAMR 10TH EDITION at 51; AAIDD 11TH EDITION at 31.

[29]AAMR 10TH EDITION at 51; AAIDD 11TH EDITION at 31.

standardized instruments.[30]

In general, the first criterion for a diagnosis of mental retardation requires "significant limitations . . . in intellectual functioning," or put another way, "significantly subaverage intellectual functioning."[31]   The APA and AAMR/AAIDD define this to mean an IQ score approximately two standards deviations below the mean of 100, taking into consideration the standard error of measurement for the IQ test used.[32]

Two standard deviations below the mean of the test relevant here would be a score of 70.  That is not, however, the cutoff score typically used, because the APA and AAMR/AAIDD direct that the test's measurement error must be taken into account when interpreting its result.[33]   The AAMR/AAIDD has noted that the standard error of measurement "which has been estimated to be three to five points on well-standardized measures of general intellectual functioning" should be

---

[30]AAMR 10TH EDITION at 51; AAIDD 11TH EDITION at 31.

[31]AAMR 10TH EDITION at 1; AAIDD 11TH EDITION at 5; DSM-IV-TR at 49.

[32]DSM-IV-TR at 41–42, 48–49; AAMR 10TH EDITION at 57–59; AAIDD 11TH EDITION at 31.

[33]AAMR 10TH EDITION at 57 ("The assessment of intellectual functioning through the primary reliance on intelligence tests is fraught with the potential for misuse if consideration is not given to possible errors in measurement.").   *See also* AAIDD 11TH EDITION at 36 ("Understanding and addressing the test's standard error of measurement is a critical consideration that must be part of any decision concerning a diagnosis of ID that is based, in part, on significant limitations in intellectual function.").

considered, resulting in a range of scores with an attendant range of confidence.[34]

"Thus an IQ standard score is best seen as bounded by a range that would be approximately three to four above and below the obtained score."[35]

There is also general agreement among the APA, AAMR and the testifying experts in *Hardy* that a score of 75 should be used as the upper bound of the IQ range describing mild mental retardation.[36]  The Court therefore again finds as a factual matter that a diagnosis of mental retardation requires an IQ score of 75 or less on one of the standard IQ tests.

1.   Smith's IQ Scores

Both Dr. Zimmerman and Dr. Swanson administered the WAIS-III to Smith,

---

[34]      "This means that if an individual is retested with the same instrument, the second obtained score would be within one *SEM* (i.e., ± 3 to 4 IQ points) of the first estimate about two thirds of the time. . . . Therefore, an IQ of 70 is most accurately understood not as a precise score, but as a range of confidence with parameters of at least one *SEM* (i.e., scores of about 66 to 74; 66% probability), or parameters of two *SEMs* (i.e., scores of 62 to 78; 95% probability). . ."
AAMR 10TH EDITION at 57 (citations omitted).  *See also* AAIDD 11TH EDITION at 36.

[35]AAMR 10TH EDITION at 57.  *See also* AAIDD 11TH EDITION at 36.

[36]DSM-IV-TR at 48; AAMR 10TH EDITION at 58–59; *see, e.g.*, *Bobby v. Bies*, 129 S. Ct. 2145, 2149–50 (2009) (describing expert testimony that set the cutoff at 75); *In re Hearn*, 376 F.3d 447, 454 n.6 (5th Cir. 2004) (citing with approval the AAMR's definition).  The Court notes that the AAIDD replaces establishing a cutoff score, with the caution "given that the diagnostic process involves drawing a line of inclusion/exclusion, it is important to use a range as reflected in the test's standard error of measurement."  AAIDD 11TH EDITION at 40.

on October 28, 2004 and April 19, 2006, respectively.[37]   The WAIS-III was the
current version of the test at the time of each assessment, and consisted of two
general components or scales.[38]   The verbal scale in turn consisted of six subscales
or subtests, and the performance component consists of five subscales.[39]
Psychologists use IQ testing to measure intelligence and the WAIS-III is a gold
standard for this testing.[40]

Both psychologists found Smith to have a Full Scale IQ of 67.   In addition,
Dr. Zimmerman found Smith to have a Verbal IQ of 68, and a Performance IQ of
74.[41]   Dr. Swanson assessed Smith's Verbal IQ at 67, and his Performance IQ at
73.[42]   The results were nearly identical as to the Verbal and Performance IQs and
were identical as to the Full Scale IQ.   This alone supports the reliability of the
results.

Assuming these scores are correct, they satisfy the first criteria for mental
retardation without correction for the Flynn Effect.   The Court however finds the

---

[37]Deft. Exhs. 1 & 3.

[38]The WAIS-III also satisfies the AAMR/AAIDD that "intellectual
functioning should be measured using individually administered standardized
psychological tests and administered by appropriately trained professionals."
AAMR 10TH EDITION at 52.   *See also* AAIDD 11TH EDITION at 41; DSM-IV-TR at
41.

[39]Deft. Exhs. 1, 3 & 4; Rec. Doc. 1583 at 16.

[40]Rec. Doc. 1583 at 100-01; Rec. Doc. 1584 at 491.

[41]Deft. Exh. 3.

[42]Deft. Exh. 1 at 2.

Flynn Effect should be applied to the WAIS-III scores.[43]  This  produces a corrected IQ score of 64-65.[44]

The WAIS-III is made up of a number of different subtests.   A chart was introduced by the defense comparing Smith's raw scores and standard scores on eleven of the subtests from Dr. Zimmerman and Dr. Swanson's administration.[45] The raw scores are the actual scores achieved on each subtest;  these are then converted into standard scores which represent a range.   For example, a raw score of 7 or 8 on Picture Arrangement yields the same standard score of 7.   A raw score of 11 or 12 on Block Design yields the same standard score of 4.

The raw scores Smith achieved on the two administrations of the tests were remarkably consistent.  For two of the subtests, the score was identical under Dr. Zimmerman and Dr. Swanson, and six others have only a one digit difference. This clustering of scores was even more pronounced when converted to standard scores.   With that conversion,   Smith's scores were identical for Dr. Zimmerman and Dr. Swanson on five of the eleven subtests, with only a one digit difference on five others.   The only subtests where a greater disparity occurred was Vocabulary,

---

[43]The Court's analysis of the Flynn Effect and reasons for accepting it as a valid correction are the same as those set forth in greater detail in *Hardy*, 762 F.Supp.2d at 857-63.

[44]Deft Exh. 2 at 4;  Rec. Doc. 1583 at 69-70; Rec. Doc. 1584 at 495; Rec. Doc. 1585 at 678-79.  The Court notes that Dr. Cunningham's report calculated the Flynn-corrected score at 62.  Deft. Exh. 2 at 4.

[45]Deft. Exh. 34.  Dr. Swanson did not complete the WAIS-III with Smith, not reaching the last three of the fourteen subtests.   Hence the comparison is of the eleven subtests both doctors completed.  *See also* Rec. Doc. 1585 at 623-25.

where Dr. Zimmerman's standard score was a 6 and Dr. Swanson's was a 4.   But even with that disparity, the difference was still within the standard error of measurement, and therefore statistically insignificant.[46]   In addition, Dr. Cunningham testified that the Vocabulary section of the test constituted only 9% of the IQ score, with the other 91% of the results substantial similar, if not identical.[47] Dr. Zimmerman testified that this consistency between test results indicates they are an accurate measure Smith's actual functioning.[48]   Dr. Swanson also testified that this consistency indicated "inter-rater reliability between testers" which means consistent effort on both tests.[49]   Finally, Dr. Cunningham likewise testified that the consistency of the results, all the way down to the subtest standard scores, indicate good effort and reliability.[50]

> 2.   Criticism of IQ Scores by Dr. Hayes

Dr. Hayes, nonetheless, found several aspects of the comparative IQ testing to criticize which she asserted undermined their reliability.   First, she pointed out that Smith was unable to consistently repeat three digits backwards from memory on one subtest, while he was able to reorder four and five digit letter combinations

---

[46]Rec. Doc. 1583 at 20-21.

[47]Rec. Doc. 1585 at 624-25.

[48]Rec. Doc. 1583 at 22.

[49]*Id.* at 70-71.

[50]Rec. Doc. 1585 at 621-25.

18

into a sequential order on another subtest.[51]  To put this in context, the Digit Span recitation is part of the IQ test.   A series of numbers are read to the individual and they are to recite them back from memory, either in the same forward sequence, or backwards, depending on the instructions.  With Dr. Zimmerman, Smith was able to recite up to five digits forward correctly, and just up to two digits backwards correctly.[52]   With Dr. Swanson, Smith likewise was able to remember up to five digits forward and again only two digits backwards.[53]   Since these are identical results, the Court finds they indicate reliability.  Dr. Hayes, however, chose to compare these *consistent* scores on the Digit Span to results from a *different* test, Letter-Numbering Sequencing, arguing inconsistency *between them*.   As a threshold, the Court questions the appropriateness of comparing the results of one subtest with a different subtest and then arguing they are somehow inconsistent.  It is akin to the proverbial comparing of apples with oranges.   Dr. Cunningham testified persuasively that it is not accepted practice in the professional community to compare answers to even the *same* question from one administration to another since natural variations occur within the same person from test to test.[54]

In any event, in the Letter-Numbering Sequencing subtest, the person is read several numbers and letters and told to recite them back in the proper

---

[51]Rec. Doc. 1584 at 423-24.

[52]Govt. Exh. 36 at 9.

[53]Govt. Exh. 35 at 7.

[54]Rec. Doc. 1585 at 614-15.

numbering order followed by the proper letter order.   With Dr. Zimmerman,  Dr.

Hayes stated that Smith was able to get three trials of four digit sequencing correct

and one out of three attempts at five digit sequencing.[55]   Dr. Hayes also testified

that Dr. William Gouvier administered the same test to Smith and Smith

successfully sequenced  two of the four digit combinations and two of the five digit

combinations.[56]   The Court finds the comparison between Dr. Zimmerman and

Dr. Gouvier noteworthy because again Smith performed roughly the same between

the same two tests.  The Court finds that Dr. Hayes' comparison of *different* tests

highly questionable, and concludes that the consistency between the *same* test

administrations–Dr. Zimmerman and Dr. Swanson as to Digit Span and Dr.

Zimmerman and Dr. Gouvier as to the Letter-Number Sequencing–supports the

reliability of the testing.

The next challenge Dr. Hayes had to the WAIS-III administrations dealt with

vocabulary.   According to Dr. Zimmerman's testing, when he asked Smith what a

ship was, Smith said it moves cargo and people from place to place on water.[57]

With Dr. Swanson, the response was "metal" followed by a pause, then something

inaudible and then an "I don't know."[58]   Since Smith had been in the Navy, Dr.

---

[55]Rec. Doc. 1584 at 425.

[56]Dr. Gouvier's results were not offered as an exhibit by either the
government or the defense so the Court has no means of verifying the results, but
presumes them reliable based on Dr. Hayes' representation.  Dr. Swanson did not
administer this particular test.  Govt. Exh. 35 at 10.

[57]Govt. Exh. 36 at 3;  Rec. Doc. 1583 at 43; Rec. Doc. 1584 at 426.

[58]Govt. Exh. 35 at 1.

Hayes thought his response completely illogical.[59]   She testified when she asked Smith the same question during their lengthy interview, more specifically what another name for a ship was, he correctly answered vessel.[60]   Dr. Hayes' recitation of what happened during the interview, however, is significantly truncated.   During that interview, when she first asked Smith what a ship was, he paused and said "What is a ship?  A ship...how can I put this?"  shaking his head, followed by a long pause.  The interview was interrupted by someone knocking on the door.  After the interruption, Smith suggested to Dr. Hayes that she ask him another question.[61]   So she asked him a different question, but then returned a short while later to the definition of a ship, specifically saying,  "Now what is a ship?  What's a ship mean?  Or what's another word for a ship?"   Dr. Hayes herself admitted that her prompting him for an alternative word for a ship is not allowed on the WAIS-III.[62]   Smith nonetheless continued to struggle:  "What's the other word for a ship?"  And then finally said, "I don't know.  A vessel."[63]   The Court does not doubt that Smith knows what a ship is, but the whole purpose of

---

[59]Rec. Doc. 1584 at 426.

[60]*Id.* at 427.

[61]This statement is not in the transcript of the interview but is clearly stated in the video.  Deft. Exh. 5 at 000356; Govt. Exh. 42, att. Disc 5 at 50:58.

[62] Rec. Doc. 1584 at 529-30.   Dr. Cunningham testified that Dr. Hayes' idiosyncratic use of the WAIS items, without the standard instructions and with impermissible prompts, was unacceptable in the scientific community.  Rec. Doc. 1585 at 617-18.

[63]Deft. Exh. 5 at 182, 000356.

this hearing was to determine his level of intelligence and cognition.   The fact that

a person who served in the Navy would still have difficulty defining a ship and

needed prompts to finally come up with even a hesitant answer is a significant

indicator of cognitive deficits.   Dr. Hayes completely glossed over this in her

account, which calls into question both her qualifications and her credibility.

Additionally, the fact that Smith likewise struggled in defining a ship to Dr.

Swanson, who presumably administered the test correctly, without prompts,

reinforces this conclusion.   And with regard to Dr. Zimmerman's account, while

Smith gave a correct definition, it is unknown how long it took him to do so.

 Dr. Hayes also focused on two other "vocabulary" discrepancies between

Dr. Zimmerman's testing and Dr. Swanson's.[64]   The vocabulary subtest consisted

of some 25 items to define, of which Dr. Hayes picked out three to challenge.

However, the vast majority of the answers were consistent between the two tests,

again supporting reliability.[65]

 Dr. Hayes also highlighted one discrepancy in Smith's responses in the

---

[64] Rec. Doc. 1584 at 427.  When asked by Dr. Zimmerman what "yesterday" meant, Smith answered "the day before" whereas with Dr. Swanson, he said "past tense, and with Dr. Hayes he said "a past day."  Dr. Zimmerman asked him the meaning of "designate" and he said "a specific area or place" while with Dr. Swanson he said he did not know.  Govt. Exh. 36 at 4; Govt. Exh. 35 at 2; Deft. Exh. 5 at 182, 000356.

[65]Consistent answers on the two tests include the definition of "repair"("to fix"), "terminate" ("get rid of"), "consume" ("take in" and "take it all in"), "confide" ("trust somebody" and "tell something you don't want told to others"), "compassion" ("feel for a person; sorrow" and "sympathize") and "sanctuary" ("place where go to meditate, be by self" and "safe place").  *See* Govt. Exh. 35 at 3-4; Govt. Exh. 36 at 1-2.

22

subtest regarding "similarities."[66]  When asked by Dr. Zimmerman how a table and chair are alike, he correctly said that both were furniture, but when asked by Dr. Swanson, he said they are both used for a purpose, then said he did not know.[67] Regardless of how they might have been scored, both initial answers correctly described how they were in fact similar.  And, again, the remaining answers were largely consistent on that subtest as well.[68]

Under the Information subtest, Dr. Hayes found a discrepancy in the response to who Martin Luther King was.   With Dr. Zimmerman, Smith said he was a black man while with Dr. Swanson, he said he was a freedom fighter.[69]   Dr. Hayes, as did Dr. Zimmerman, considered the answer of a "black man" to be unacceptable.[70]  Nonetheless, it was not an incorrect answer.

Citing these individual examples, Dr. Hayes claimed it showed that Smith was not responding consistently, even though she conceded that the discrepancies were not of statistical significance.[71]   The Court concludes to the contrary.   The

---

[66]Rec. Doc. 1584 at 428.

[67]Govt. Exh. 36 at 6; Govt. Exh. 35 at 4.

[68]"Piano-Drum" were  "instruments" & "make music"; "Orange-Banana" were  "fruit" on both tests; "Boat-Automobile" were "transportation" and "transport"; "Steam-Fog" were "both smokey" and "cloudy."  And on both tests, Smith was unable to identify how "Work-Play" were similar nor how "Egg-Seed" were similar.  Govt. Exh. 35 at 4; Govt. Exh. 36 at 6.

[69]Govt. Exh. 35 at 7; Govt. Exh. 36 at 9.

[70]Rec. Doc. 1584 at 428-29.

[71]*Id.* at 429.

overwhelming evidence is that Smith's responses on both tests were entirely consistent at every meaningful level.  As Dr. Zimmerman testified, one should look to the overall response pattern, which is reflected in the raw scores and the scale scores, to assess consistency and reliability.[72]  Dr. Hayes' idiosyncratic picking apart of a few isolated responses to challenge the overall results was overreaching and simply not credible.

As further support for the reliability of the Dr. Zimmerman-Dr. Swanson testing, their results are consistent with other IQ-related assessments of Smith's cognitive capacity.   Unquestionably, as already noted, the WAIS-III is recognized as a gold standard for IQ testing.[73]   Smith's Full Scale Score of 67 was identical on both Dr. Swanson's and Dr. Zimmerman's test and falls within the range of mild mental retardation.   In earlier years, while a student, Smith had taken two Otis IQ tests, which are group administered, hence less reliable than individual testing but nonetheless useful as corroboration.[74]   When Smith was in the 7th grade,  at the age of 13, he took an Otis Beta test which resulted in an IQ score of either 69 or 65 (the IQ score is obscured).[75]   Either score falls into the mild mental retardation range.  This is also significant as supporting the third requirement for a diagnosis of

---

[72]Rec. Doc. 1583 at 45.

[73]Dr. Hayes concurs.  Rec. Doc. 1584 at 491.   *See also* Rec. Doc. 1585 at 625-26 (Dr. Cunningham).

[74]Govt. Exh. 2 at 2 (bottom); Deft. Exh. 6 at 372 (bottom); Rec. Doc. 1583 at 100-01.

[75]Rec. Doc. 1583 at 7-9.

mental retardation - onset before the age of 18.[76]   In 1964, when Smith was 16 years old and in the 10th grade he took an Otis Gamma Test, scoring a numeric IQ of 75 which was classified by the document as "boderline" (sic).[77]   With consideration of the typical standard error of measurement for IQ tests, a score of 75 is the outer edge of mild mental retardation.  While both of these tests were group administered, they were done so in a school setting, which required certain prior training and the following of proper protocols for administration.[78]   Prior to entering the military, Smith took the Navy General Classification Test which measures verbal intelligence.[79]  Smith scored a 34 of that test, which Dr. Hayes indicated was at the 5th percentile, meaning 95% of the prospective enlistees who took the test scored higher.[80]   Dr. Swanson testified that the GCT is not an IQ test but it does highly correlate with IQ scores.[81]   She explained that the mean of the test is 50 (as compared to 100 for an IQ test), with a standard deviation ranging from 7.5 to 10, depending on which the military was using at the time, which unfortunately could not be determined.  This would place Smith's score at least one "and probably two" standard deviations below the mean.[82]  Two standard

_____

[76]*Id.* at 100-02.

[77]Govt. Exh. 2 at 2 (bottom).

[78]Rec. Doc. 1583 at 101.

[79]Rec. Doc. 1585 at 626.

[80]Govt. Exh. 42 at 22.

[81]Rec. Doc. 1583 at 150, 153.

[82]*Id.* at 150-51.

deviations below the mean on an IQ test is in the mild mental retardation range. Dr. Cunningham testified similarly, estimated the GCT score to be analogous to either a 70 or a 76, depending again on the standard deviation in use at the time.[83]

As Dr. Cunningham testified, all of these scores cluster within a range of 69 (possibly 65 on the Otis Beta) to perhaps a 76, dating back to when Smith was 13 years up through his 50's.   All but the 76 are within the range of mild mental retardation, which cuts off at 75.

One more test must be considered.   In 1977, after Smith was convicted of robbery and sentenced to prison, his tested IQ was 93, which would be in the average range, well distant from mild mental retardation.[84]   According to Dr. Hayes, this was a Revised Beta Examination, which is a nonverbal test, akin to the performance items of the WAIS, and used to quickly estimate IQ.  She acknowledged it was less reliable than a WAIS test.[85]   Dr. Swanson testified that while the Beta is not a gold standard for IQ testing,  it is usually good corroborative information.   Her concern about the validity of this particular test was the institutional prison setting and whether the testing was actually properly supervised so the results could be considered reliable.[86]   Since the results of that test were so different from the cluster of the five other scores, she found it

---

[83]Rec. Doc. 1585 at 629.  *See generally id.* at 626-29.

[84]Govt. Exh. 9.

[85]Rec. Doc. 1584 at 445-46, 519.

[86]Rec. Doc. 1583 at 117-19.

suspicious, an "outlier."[87]   Dr. Cunningham concluded likewise.[88]   The Court

agrees.   The five other scores ranged from 65 or 67 to a possible high of 76 and

essentially bookended Smith's life, beginning with three tests as a youth and

culminating in two gold standard tests in his 50's.  They are all in the mild mental

retardation range, with the Navy GCT possibly on the cusp, depending on what the

standard deviation actually was.    The 93 from the Department of Corrections

stands in stark contrast, indicating to this Court that the test was not administered

with adequate supervision to assure the integrity of the results. The Court therefore

disregards it.[89]

    *i.*    *Malingering and Bias*

    Concurrent with Dr. Hayes' claims of inconsistency between  isolated items

on the two WAIS test administrations, she also contended that neither Dr.

Zimmerman nor Dr. Swanson adequately considered malingering or biased

responding by Smith.[90]   According to the DSM-IV, malingering should be

strongly suspected  if any combination of the following are observed:

    1.  Medicolegal context of presentation;

---

[87]*Id.* at 119.

[88] Rec. Doc. 1585 at 631, 641-43; Deft. Exh. 2 at 5.

[89]Dr. Hayes cited a number of studies indicating that the Revised Beta
Examination correlates closely with various WAIS tests.  Rec. Doc. 1584 at 446-
50.  However, the relevance of those studies depends on the Texas Department of
Corrections score being a valid one.  For the reasons stated above, the Court finds
it to be unreliable.

[90]Govt. Exh. 42 at 19.

2.  Marked discrepancy between the person's claimed stress of disability and the objective findings;

3.  Lack of cooperation during the diagnostic evaluation and in complying with prescribed treatment regimen;

4.  Presence of Antisocial Personality Disorder.[91]

Obviously, in an *Atkins* situation, the context is medicolegal with potentially a life or death consequence hinging on the outcome.  Also, Dr. Hayes testified that Smith showed traits of antisocial personality disorder.[92]

On the other hand, Dr. Swanson in her report stated that Smith was "cooperative during the testing and demonstrated good effort throughout the throughout the assessment."[93]   Further on, she elaborated that "Mr. Smith put forth good effort.   He worked to the time limit on timed subtests and gave maximum time to untimed items.  He often self-corrected in an effort to get a higher score. The WAIS-III results appear to be a valid estimate of current cognitive functioning..."[94]

Dr. Zimmerman and Dr. Swanson both testified at the *Atkins* hearing and made clear they *did* consider the possibility of malingering or biased responding and found no evidence of it.   Dr. Zimmerman was qualified as an expert in

---

[91]DSM-IV-TR at 739.

[92]Rec. Doc. 1584 at 408-09.

[93]Deft. Exh. 1 at 2.

[94]*Id.* at 3.

psychology, with over thirty years experience, and testified that he has administered "hundreds, if not thousands" of WAIS version IQ tests in his career.[95]

  Specifically, with respect to malingering or response bias, Dr. Zimmerman testified that he administers these tests frequently, including for the Office of Disability Determinations where people *do* attempt to malinger, and he considers himself "pretty adept" at picking such people out.  Having given so many such tests, he has the "normative data" in his brain on how people typically respond when they are misrepresenting themselves.[96]   For example, Dr. Zimmerman testified that malingerers will frequently answer "I don't know" to the questions, or "I can't do it" on the performance items, or will stop after several questions and claim they can not do anymore.[97]   He did not see those patterns with Smith.   As an example of Smith's effort, Dr. Zimmerman testified concerning a particular performance subtest of the WAIS in which the person is asked to look at a series of pictures and identify what is missing in the picture. The pictures become progressively more complex, and the person has just 20 seconds to study and identify what is missing in each successive one.  In Smith's case, he correctly answered several simpler ones, then made mistakes on several more difficult ones, but then answered correctly, but too late on even more difficult ones.    Dr. Zimmerman testified that this shows good effort, as Smith "doesn't quit, he keeps

---

[95]Rec. Doc. 1583 at 14-15.

[96]*Id.* at 23-24.

[97]*Id.* at 24.

trying and trying" and "tries hard enough to get the correct answer" even though he has run out of time.[98]   This parallels Dr. Swanson's similar comment in her expert report, already noted, that Smith worked to the time limit on the timed subtests and gave maximum time to the untimed items.

Dr. Zimmerman further testified that had he detected that Smith was not putting forth his best effort, he would have called him on it.  And if Smith had continued to answer with "suboptimal effort," Dr. Zimmerman would have given him a malingering test and also noted his suspicions in his report.[99]   He did not give any malingering test to Smith because he believed Smith put forth his best performance.   Dr. Zimmerman had "no question" that the WAIS-III results were a valid and accurate measure of Smith's IQ.[100]

Dr. Swanson likewise testified that when she administered the WAIS-III to Smith a year and a half later, she perceived him "giving a hundred percent" and trying very hard to do well on the test.[101]   She pointed out that malingerers will frequently give up early in a timed test, saying they do not know the answer, while Smith would persist, asking for more time, even if the ultimate answer was incorrect, or, if correct, came too late for her to give him credit for it.[102]   She saw

---

[98]*Id.* at 24-25.

[99]*Id.* at 31.

[100]*Id.* at 32, 33, 37, 40-41.

[101]*Id.* at 68-69, 72.

[102]*Id.* at 72.   Dr. Cunningham testified that deliberately slowing down on the timed performance items would not be a good malingering strategy since it would

no indication that Smith was deliberately trying to dial down his answers.[103]   She also pointed out that someone trying to deliberately feign lesser ability on the first test, not knowing a second test was coming over a year later, would have great difficulty in trying to remember to feign in the same manner, considering all the subtests involved.[104]

On the other hand, both Dr. Swanson and Dr. Zimmerman acknowledged that in Mississippi, the law requires that a malingering test be given in all instances.[105]   Dr. Zimmerman testified that giving a specific malingering test would have taken less than a minute to administer.[106]   In light of the seriousness of this issue, and the brevity that such a test would take, the Court is disappointed that neither Dr. Zimmerman nor Dr. Swanson choose to administer such a test in connection with the WAIS-III.

One of the defense psychologists, Dr. William Gouvier, did in fact administer malingering tests to Smith.   Dr. Gouvier was retained to assess Smith for possible brain damage and did not administer an IQ test.   However, he did administer two malingering tests and the result indicated that Smith put forth good

---

create a suspicious disparity with the untimed verbal items; the items become progressively more difficult, alerting the examiner to feigned responses on the easier items.   Rec. Doc. 1585 at 620-21.

[103]Rec. Doc. 1583 at 71.

[104]*Id.*

[105]*Id.* at 32, 192.

[106]*Id.* at 52.

effort and was not malingering.[107]

The Court concludes that Smith did not in fact malinger or evidence response bias during the administration of Dr. Zimmerman's or Dr. Swanson's tests.   The Court comes to this conclusion in part out of deference to both Dr. Zimmerman's and Dr. Swanson's vast experience in administering the test and their clinical ability to spot subpar performance.   They both testified emphatically that in their judgment Smith gave full effort during the testing.   More importantly, the test results themselves, although a year and a half apart, were entirely consistent with each other,  not just in the final IQ assessment but in the scoring of the subtests as well.   Dr. Hayes attempted to discredit the results by picking out isolated inconsistent responses, but her limited criticisms only underscored the remarkable consistency between the two administrations.

The Court must also point out one other concern it has with regard to Dr. Hayes' testimony.  As discussed earlier, the Digit Span test is part of the WAIS-III test.   It is also significant as a so-called embedded measure to assess whether a person is putting forth good effort.[108]   Dr. Cunningham testified that the Digit Span test is where feigners frequently try to suppress their performance.[109]  Smith's total score for the digit span on both tests was at the higher end, indicating

---

[107]*Id.* at 141-43; Rec. Doc. 1584 at 506-10.   Again, Dr. Gouvier did not testify and his actual report was not made a part of the record by either the government or the defense.

[108]Rec. Doc. 1585 at 631-34.

[109]*Id*. at 634.

he was likely responding honestly.[110]  Dr. Cunningham further confirmed this by comparing Smith's Digit Span score to the Vocabulary Score, as feigners will usually have a higher Vocabulary Score than Digit Span.  In Smith's case, the score was the same on Dr. Zimmerman's administration and for Dr. Swanson, the Digit Span score was the higher one, a finding also contrary to feigning.[111]

     The Court finds disturbing that Dr. Hayes glossed over consideration of this embedded measure, which indicated Smith put forth good effort.  She did not mention it on direct examination and when questioned on cross-examination, she acknowledged the Digit Span test as an embedded measure used to assess effort, she said she looked at his results on the two administrations,  but acknowledged she did not report on his level of effort.[112]  Her explanation for not reporting on it was that for persons who may be in the mentally retarded range, the results are not reliable.[113]  This, however, is a questionable explanation.  Dr. Hayes is correct that if a mentally retarded person does *poorly* on the Digit Span test, it may be a result of deficient intelligence rather than feigning, hence the test results would be

---

     [110]*Id.* at 633-34.

     [111]*Id.* at 634-35.   Worth noting is that Dr. Hayes took issue with the discrepancy in the Vocabulary subtest score between the two WAIS-III administrations.  Dr. Cunningham testified that within the standardization groups that took the test, with no incentive to malinger, 5% likewise dropped the same amount in the vocabulary retest.  Rec. Doc. 1585 at 615.

     [112]Rec. Doc. 1584 at 519-22.

     [113]*Id.* at 521-22.

inconclusive.[114]   But since she did clearly look at Smith's Digit Span performance, as she used it to compare with his Letter-Number Sequencing, she had to have seen that his score was at the higher end, indicating *good* effort.   This failure, at a minimum, reflects on her qualifications but also indicates a resistance, similar to the "ship" episode already cited, to recognize evidence of cognitive deficits, which undermines her credibility.

Lastly, the Court is not persuaded that malingering tests are particularly effective in populations suspected of possible mental retardation.   The reason should be obvious.   If a person is genuinely mentally retarded, his responses may be similar to a person of normal intelligence who is trying to feign mental retardation.   Dr.  Cunningham testified that formal effort assessments have not been standardized against a mentally retarded population, and Dr. Swanson testified that formal malingering tests are not very reliable with persons in the lower cognitive functioning range.[115]   Therefore, using those formal assessments to determine malingering prior to first determining whether Smith is mentally retarded in the first place in effect puts the cart before the horse.

> ii.    *Other Testimony*

Dr. Hayes did not herself administer an IQ test.[116]   She stated that the

---

[114]Rec. Doc. 1585 at 631.

[115]*Id.* at 611-13; Rec. Doc. 1583 at 71, 192.

[116]Dr. Hayes testified she drew her conclusions as to Smith's intellectual functioning from his school, Job Corps, military, and prison records.  Rec. Doc. 1584 at 432-34, 438, 441-42, 443.   While the Court considers all of this data relevant to the second prong of a mental retardation determination–adaptive

Court's requirement that the testing be video-taped caused her ethical problems. She explained that the possibility that the questions would become public would undermine the validity of future testing. She contended that even if the testing was sealed and available only to the attorneys that was not good enough to assure confidentiality.[117]  While the Court presumes Dr. Hayes' ethical concerns are genuine, the Court is not persuaded that her conclusion is a reasonable one.  The Official Position Statement of the National Academy of Neuropsychology, which she referenced, counsels against "uncontrolled" test release, but goes on to suggest as "potential resolutions....protective arrangements or protective orders from the court."[118]  Furthermore, in the summer of 2008, the next generation of WAIS IQ testing became available–the WAIS-IV.[119]  The *Atkins* hearing was not until almost a year later, in 2009.  Dr. Hayes could have administered the older WAIS-III during that interim period, the same test administered by Dr. Zimmerman and Dr. Swanson, since it had in effect become obsolete for future testing purposes.

Two other points raised by Dr. Hayes need brief attention.  In her report, she included an analysis of Smith's IQ based on demographic characteristics,[120]

---

behavior–the Court finds them no substitute for a properly administered IQ test, which is a prerequisite for prong one.

[117]*Id.* at 492, 493-94; Rec. Doc. 1585 at 576-79, 585-88.

[118]Govt. Arts. 17, 18.

[119]Rec. Doc. 1585 at 581.

[120]Andres Barona, Cecil R. Reynolds & Robert Chastain, *A Demographically Based Index of Premorbid Intelligence for the WAIS-R*, 52 J. CONSULTING & CLINICAL PSYCHOL. at 885 (1984)[hereinafter Barona Study].  Although a copy of

coming up with an IQ in the Average range.[121]   Dr. Cunningham testified that the lowest possible score a 59 year old black man could receive–"(e)ven if he's been hospitalized and is in a coma his whole life"–was a 73.9.[122]   When asked if this figure was correct, Dr. Hayes resisted conceding it, but ultimately could not deny it since it is an objectively calculable finding.[123]   She did acknowledge that the Barona formulas are less accurate in the lower ranges of intelligence and that the formula has a "pretty large standard of error."[124]   That is an understatement as Dr. Cunningham estimated the standard of error to be plus or minus 20 points.  In Smith's case, that would mean that there was a  95% likelihood of his IQ being between 50 and 95, which is essentially meaningless as a calculation.  The Court has rejected this imputation based on the Barona Study from Dr. Hayes before, and does so again.[125]

In addition, Dr. Hayes testified at the hearing to an extrapolation of IQ based on data from an unscored neuropsychological test, the Wechsler Memory Scale ("WMS-III"), which had been administered by Dr. Gouvier.[126]   She testified that

---

this study was not offered for inclusion in this record, it was included in the *Hardy* record.   *See Hardy*, 762 F.Supp.2d at 878.

[121]Govt. Exh. 42 at 26.

[122]Rec. Doc. 1585 at 675-76.

[123]Rec. Doc. 1584 at 530-34.

[124]*Id.* at 531-32.

[125]*See Hardy*, 762 F.Supp.2d at 878.

[126]Rec. Doc. 1584 at 452-56.

the manual allows for an extrapolation from IQ scores to predicted WMS scores, and she testified that she simply did the reverse, producing from the WMS score an implied predicted IQ of 91.[127]  When asked if this was a standard practice of psychologists to do the reverse extrapolation, she thought that many would but she did not know in fact if any actually did.[128]  Dr. Cunningham, on the other hand, was able to shed light on the problem with Dr. Hayes' reverse extrapolation.[129]  He explained that the purpose of using an established IQ score to extrapolate to an estimated score on the WMS is to determine if a person has an impaired memory relative to his overall intelligence.  An IQ score represents a broad range of cognition.  Memory is only one aspect of intelligence, and the WMS only covers about one-third of what goes into an IQ score.  The remaining two-thirds are not memory related.  So while it may well be appropriate to take a known IQ score to predict whether that single factor of memory is impaired, it is not appropriate to use that one single factor of memory capacity and backtrack to a full scale IQ.   For that reason, Dr. Cunningham stated emphatically that her reverse extrapolation was not acceptable in the professional and scientific community.[130]  The Court agrees.

3.    The Court's Finding re: Smith's Intellectual Functioning

The issue of IQ should have been a non-issue in this case based on the clear

---

[127]*Id.* at 456.

[128]*Id.* at 538.

[129]Rec. Doc. 1585 at 616-17, 735-36.

[130]*Id.* at 616.

guidelines of the APA and AAMR/AAIDD and the evidence.  The Court finds that all of the credible evidence lends full support to the WAIS-III scores, and that the defendant has established well beyond a preponderance of the evidence that his intellectual functioning is more than two standard deviations below the mean, with or without correction for the Flynn Effect.   The Court finds that Smith therefore possesses significantly subaverage intellectual functioning as that term is used to diagnose mental retardation.  The Court now turns to the other criteria relevant to this diagnosis.

**b.   Factor Two:  Significant Limitations in Adaptive Functioning**

The Court next considers whether Smith has proven that he exhibits the significant limitations in adaptive functioning required for a finding of mental retardation.   That factor is defined as follows:

> Concurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.[131]

The AAMR/AAIDD echoes this requirement: "significant limitations . . . in adaptive behavior as expressed in conceptual, social, and practical adaptive

---

[131]DSM-IV-TR at 49.

skills."[132]   Those two standards underpin what is referred to as the "adaptive

behavior" prong of the diagnosis of mental retardation developed by APA and

AAMR/AAIDD.  The focus is on "'how effectively individuals cope with common

life demands and how well they meet the standards of personal independence

expected of someone in their particular age group, sociocultural background, and

community setting.'"  *Wiley,* 625 F.3d at 216 (quoting DSM-IV-TR at 42).

The definition of this prong is less settled than that for intellectual

functioning.[133]   For IQ, the APA and AAMR/AAIDD are in substantial agreement

on the standard to be used:  a score of 75 or below on one of the generally accepted

tests of intelligence.  For adaptive behavior, the current version of the APA's

guidance requires concurrent deficits in at least two of eleven relatively specific

areas of adaptive functioning.[134]   The AAMR/AAIDD takes a more holistic

approach and treats adaptive behavior as a global characteristic that finds

expression in three relatively abstract areas of functioning—conceptual, social, and

practical—and requires deficits in just one of these three general domains to reach

a finding of mental retardation.[135]   That is, "the three broad domains of adaptive

behavior in [the AAMR's] definition represent a shift from the requirement . . . that

---

[132]AAMR 10ᵀᴴ EDITION at 8; *see also* AAIDD 11ᵀᴴ EDITION at 6.

[133]Since there has been no change in the guidance given by the APA and
AAMR/AAIDD in the interim, this definitional section for adaptive functioning is
largely duplicative of that set forth in the opinion issued by this Court in *Hardy,*
762 F.Supp.2d at 879-81.

[134]*See* DSM-IV-TR at 49.

[135]*See* AAMR 10ᵀᴴ EDITION at 13; AAIDD 11ᵀᴴ EDITION at 6.

a person have limitations in at least 2 of the 10 specific skill areas listed in [the AAMR's] 1992 definition," which was the model for the approach still used by the APA.[136]   The AAMR/AAIDD moved away from that model because "[t]he three broader domains of conceptual, social, and practical skills . . . are more consistent with the structure of existing measures and with the body of research on adaptive behavior."[137]

While these differences in definition are noteworthy, they encompass the same range of behaviors. See *Wiley*, 625 F.3d at 216.   Both the APA and the AAMR/AAIDD direct clinicians to the same standardized measures of adaptive behavior, such as the Vineland Adaptive Behavior Scales–II (VABS-II) and the Adaptive Behavior Assessment Scale-Second Edition (ABAS-II).[138]   Still, as evidenced by the DSM-IV-TR's referral of clinicians to the AAMR's instruments, the AAMR/AAIDD has taken the lead in developing the guidelines for interpreting the results of those tests.   The Court finds it appropriate therefore to primarily rely on the AAMR/AAIDD's procedures for evaluating the defendant's level of adaptive functioning.[139]

---

[136]AAMR 10ᵀᴴ EDITION at 73.

[137]*Id*. at 73, 78; AAIDD 11ᵀᴴ EDITION at 43-45.

[138]*See* DSM-IV-TR at 42; AAMR 10ᵀᴴ EDITION at 76–78; AAIDD 11ᵀᴴ EDITION at 43-48.   Referred to as the AAMR ABS, before the change in name, it is now in a second edition, the ABAS-II.

[139]*See* DSM-IV-TR at 42.   This does not mean that the APA's approach deserves less weight, but only that the AAMR/AAIDD's is better developed.   The APA devotes only two paragraphs to adaptive behavior in its standard reference work and refers the reader elsewhere for information concerning the relevant tests;

The AAMR/AAIDD uses the following criteria for determining whether someone has significant limitations in adaptive functioning:

> [P]erformance [must be] at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills.[140]

The AAMR/AAIDD repeatedly emphasizes that a diagnosis of significant limitations should be made whenever a person has performed at least two standard deviations below the mean in any of the three domains or in the total score.[141]

A person is evaluated by using a standardized test, including the VABS-II and ABAS-II.[142]   As with the tests of IQ, the scores on these tests for each domain, as well as the overall score, must be evaluated in light of the standard errors of measurement for the test.[143]  "If a person has a score that does not meet the cutoff but is within one standard deviation of the cut-score, it is advised that the score be reevaluated for reliability or the individual should be reassessed with another measure."[144]

"The assessment of adaptive behavior focuses on the individual's typical

_____

the AAMR/AAIDD, on the other hand, devotes chapters to the concept and has played a key role in developing the assessment instruments used.

[140]AAMR 10TH EDITION at 14; AAIDD 11TH EDITION at 43.

[141]See AAMR 10TH EDITION at 74, 76, 78; AAIDD 11TH EDITION at 43, 46-47.

[142]See AAMR 10TH EDITION at 77, 87–90.

[143]Id.; AAIDD 11TH EDITION at 47-49; USER'S MANUAL at 12-13.

[144]AAMR 10TH EDITION at 79.

41

performance and not their best or assumed ability or maximum performance. ...
This is a critical difference between the assessment of adaptive behavior and the
assessment of intellectual functioning, where best or maximal performance is
assessed."[145]

> None of the generally accepted scales of adaptive behavior rely on direct
observation of the person nor upon his own self-report of what he is capable of
doing.  Rather, the clinician is to gather adaptive behavior information from third
parties.[146]  In selecting the informants, it is "essential that people interviewed
about someone's adaptive behavior be well-acquainted with the typical behavior of
the person over an extended period of time, preferably in multiple settings."[147]
"Very often, these respondents are parents, older siblings, other family members,
teachers, employers, and friends."[148]  "Observations made outside of the context of
community environments typical of the individual's age peers and culture warrant
severely reduced weight."[149]  The informants should also be asked to provide
information about the person's day-to-day level of functioning, as well as data on
the amount of support the person needs in order to carry out any of the relevant

---

[145] AAIDD 11TH EDITION at 47.

[146] AAMR 10TH EDITION at 85; AAIDD 11TH EDITION at 47.

[147] AAMR 10TH EDITION at 85; *see also* AAIDD 11TH EDITION at 47.

[148] AAIDD 11TH EDITION at 47.

[149] AAMR 10TH EDITION at 85; *see also* AAIDD 11TH EDITION at 47.

functions.[150]

2.      Retrospective Diagnosis[151]

Unlike in a medical, educational, or social services context, the law is

concerned with what was rather than what is.  The point of an *Atkins* hearing is to

determine whether a person was mentally retarded at the time of the crime and

therefore ineligible for the death penalty, not whether a person is currently

mentally retarded and therefore in need of special services.  Because of this, the

diagnosis of mental retardation in the *Atkins* context will always be complicated by

the problems associated with retrospective diagnosis.

These problems are only compounded by the fact that both the APA and

AAMR/AAIDD define mental retardation as a developmental disability and limit

the diagnosis to those persons who exhibited the required characteristics prior to

age 18.  As those under the age of 18 are already constitutionally ineligible for the

death penalty, *Roper v. Simmons*, 543 U.S. 551 (2005), no clinician evaluating a

person for purposes of an *Atkins* hearing will ever be evaluating the person prior to

age 18.  Mental retardation in the *Atkins* context, if it is to be diagnosed at all, must

therefore be diagnosed retrospectively.

So, while the APA speaks of "[c]oncurrent deficits or limitations in present

---

[150]AAMR 10ᵀᴴ EDITION at 74–75; AAIDD 11ᵀᴴ EDITION at 45, 47.

[151]Again, this section is largely unchanged from that set forth in the opinion
issued by this Court in *Hardy,* 762 F.Supp.2d at 881-82.

adaptive functioning,"[152] it is clear that the assessment of mental retardation for

purposes of *Atkins* looks backwards—beyond even the time of the crime and back

into the developmental period.[153]  Certainly a person's level of adaptive

functioning in the present might provide some information about his abilities

during the developmental period as a person without limitations in the present is

less likely to have had limitations before, and a person with limitations today is

more likely to have had them during the developmental period.  But particularly

with the mildly mentally retarded, who tellingly used to be labeled the

"educable,"[154] the AAMR/AAIDD has been clear that a person's current strengths

and weaknesses are not the best evidence of the relevant facts in an *Atkins*

hearing.[155]

---

[152] DSM-IV-TR at 49.

[153]The concurrence of deficits in intellectual functioning and adaptive
behavior referred to in the DSM-IV-TR is best understood as meaning that, during
the developmental period, a person must exhibit deficits in both categories at the
same time.  Understood that way, the language excludes from the diagnosis those
who, despite a low IQ, did not develop deficits in adaptive functioning until later
(or vice versa, for example if an injury causes a low IQ after the developmental
period).  Even if a person's level of adaptive functioning outside of the
developmental period were relevant, it is clear from *Atkins* that it would be the
level of adaptive functioning at the time of the crime, not the time of hearing, that
is relevant.  *See Atkins*, 536 U.S. at 315–21; *see also Pizzuto v. State*, 202 P.3d 642,
648 (Idaho 2008) ("[*Atkins* prohibited] the imposition of a death sentence upon
offenders who are mentally retarded at the time of their crime.").

[154]DSM-IV-TR at 43.

[155]*See, e.g.*, AAIDD 11TH EDITION at 95–96 (relegating contemporary
assessment to a possible additional tool); *id.* at 46 (noting retrospective diagnosis
requires evaluation of subject's "previous functioning").

With IQ, which is a relatively stable, immutable trait,[156] the problems associated with retrospective diagnosis mostly disappear.  Absent intervening trauma or injury, a person's IQ tested after the developmental period is likely to be quite close to the IQ that would have been obtained had the person been tested prior to age eighteen.[157]  The closest that retrospectivity comes to influencing the IQ prong of the test is the Flynn Effect.  But that phenomenon is an artifact of the instruments used to assess intelligence, not a consequence of retrospective diagnosis *per se*.  Evaluating someone's adaptive behavior, on the other hand, is less stable even in theory, and difficult to assess in practice, and all the more so when done retrospectively.

The committee of the APA responsible for mental retardation, Division 33, as well as the AAMR/AAIDD have developed guidelines to help clinicians navigate the difficulties associated with retrospective diagnosis.  The guidelines in the AAIDD's USER'S GUIDE are the most detailed.  Relevant to adaptive behavior, they direct clinicians to:

(1) Conduct a thorough social history;

(2) Conduct a thorough review of school records;

---

[156]*See, e.g.*, Rec. Doc. 1583 at 75; AAMR 10TH EDITION at 51–59; AAIDD 11TH EDITION at 31–42.

[157]*See* Gilbert S. Macvaugh III & Mark D. Cunningham, "Atkins v. Virginia: *Implications and Recommendations for Forensic Practice,*" 37 J. OF PSYCH. & L. 131, 148, 151 (citing Caroline Everington & J. Gregory Olley, *Implication of Issues in* Atkins v. Virginia, *Defining and Diagnosing Mental Retardation,*" Vol. 8 Forensic Psychol. Practice 1, 7 (2008) (Deft. Art. 1).  This is not to say that *assessments* of IQ, such as performance on an IQ test, may not vary.  *See id.*

. . . .

(6) Recognize that self-ratings have a high risk of error with regard to adaptive behavior;

(7) Conduct a longitudinal evaluation of adaptive behavior; and

(8) Not use past criminal or verbal behavior in assessing adaptive behavior.[158]

In addition, the  assessment of adaptive behavior should:

(a) use multiple informants and multiple contexts; (b) recognize that limitations in present functioning must be considered within the context of community environments typical of the individual's peers and culture; (c) be aware that many important social behaviors, such as gullibility and naivete, are not measured on current adaptive behavior scales; (d) use an adaptive behavior scale that assesses behaviors that are currently viewed as developmentally and socially relevant; (e) understand that adaptive behavior and problem behavior are independent constructs and not opposite poles of a continuum; (f) realize that adaptive behavior refers to typical and actual functioning and not to capacity or maximum functioning.[159]

Finally, the third-party respondents should focus on the defendant's adaptive behavior closest to the developmental period about which the informant is confident discussing, and, whatever age it is, the examiner should log that age as the date of the defendant's functioning for purposes of scoring and comparison with age-normed tables.[160]

---

[158]USER'S GUIDE at 18-22.  *See also* AAIDD 11TH EDITION at 46.

[159]USER'S GUIDE at 20; *see also* AAIDD 11TH EDITION at 46. The AAIDD 11TH EDITION did not include in the list the AAMR USER'S GUIDE factor "(e)"; instead, that factor received separate discussion outside of the realm of retrospective diagnosis as "Adaptive Behavior Versus Problem Behavior." AAIDD 11TH EDITION at 46, 49.

[160]*See, e.g.*, Rec. Doc. 1584 at 364, 417.

2.      Clinical Judgment in Adaptive Functioning Assessment

The Court has previously noted how objective the first prong of the APA and AAMR/AAIDDD assessments is–an IQ measured on a recognized standardized test–as compared to the second prong, which relates to adaptive behavior.  The second prong involves significantly more subjective clinical judgment.  *Hardy*, 762 F.Supp.2d at 883.  As noted by the Fifth Circuit, "The assessment of adaptive functioning deficits is no easy task.  Because its conceptualization 'has proven elusive,' adaptive functioning 'historically has been assessed on the inherently subjective bases of interviews, observations, and professional judgment.'" *Wiley*, 625 F.3d at 218 (internal citation omitted).

This greater degree of subjectivity has two consequences.  First, as the degree to which a matter is left to an individual clinician's judgment increases, so does the degree to which the Court must rely on its assessment of the relative competence and credibility of the individual experts to resolve disputes between them.  Second, as the need for clinical judgment increases, so does the opportunity for disputes between clinicians.

The defense and government experts are diametrically opposed with regard to adaptive behavior, echoing the Court's previous experience with Dr. Swanson and Dr. Hayes in *Hardy*.  *Hardy*, 762 F.Supp.2d at 884.  Dr. Swanson found that "Mr. Smith has substantial limitations in the areas of self-care, understanding and use of language, learning, self-direction, capacity for independent living, and economic self-sufficiency with evidence of onset prior to the age of 18 that meet

the criteria for a diagnosis of Mental Retardation in DSM-IV-TR, the AAMR 10TH EDITION and La.C.Cr.P. art. 905.5.1(H)(1)," and that Smith's conceptual, social and practical adaptive skills scores, as well as his overall score, were similarly low.[161]   On the other hand, Dr. Hayes found "no significant adaptive functioning deficits . . . [w]hen heroin use and legal difficulties are factored out of Mr. Smith's day-to-day functioning."[162]   As in *Hardy,* the Court finds that such a drastic disagreement from two experts in the same field can be attributed, in part, to the relative subjectivity involved in the assessment of adaptive behavior, the fact that the deficits of a mildly mentally retarded person are not extreme, and the varying experience and competence of the experts called to testify.   *Hardy*, 762 F.Supp.2d at 884.

3.     Dr. Swanson's Adaptive Functioning Assessment

i.     *Adaptive Probes*

Dr. Swanson testified that she did some adaptive probes with Smith during her interview with him on April 19, 2006.[163]   The probes were practical testing to see what Smith could do and how long it takes him.[164]   She administered an

---

[161]Deft. Exh. 1 at 5; Rec. Doc. 1583 at 223-24.

[162]Govt. Exh. 42 at 45.

[163]Rec. Doc. 1583 at 73.

[164]*Id.* at 74.

abbreviated version of the Kaufman Test of Educational Achievement-II ("KTEA-II"), a gold standard in achievement testing, to assess and screen Smith's functioning with certain mathematics, reading and spelling skills.[165]   Dr. Swanson found that his deficits outweighed his strengths, and that his current functioning was the same as reflected in school and Job Corps records that indicate a 4th grade mathematics level, meaning he had not improved in the ensuing years and continued to qualify as mentally retarded in Functional Academics.[166]   She testified that he was able to identify approximately 214 out of 220 sight or "Dolch" words, which are words that children learn quickly by the 3rd grade.   Children will, however, commonly mix up the letters–saying "but" instead of "put," but will grow out of that tendency.  She saw such reversals with Smith, unusual for his age, some of which he self-corrected, some of which he did not.   In addition, she found that he reads so slowly that he forgets information, indicating reading comprehension problems consistent with earlier records indicating a 3rd grade reading level.[167]

### ii.    VABS-II and ABAS-II Scores

Dr. Swanson's choice of respondents for her assessment of Smith's adaptive

---

[165]*Id.* at 75-76, 81-82.   Dr. Swanson testified that she did not score the KTEA-II for her report, but did forward the score sheet to Dr. Gouvier's at his request for his use as a "rough estimate" during his assessment.  *Id.* at 78.

[166]*Id.* at 80-82, 106-08.

[167]*Id.* at 83-84; Rec. Doc. 1584 at 332-33.

functioning was appropriate,[168] albeit in a retrospective context.   On May 15, 2006, she performed VABS-II assessments using Smith's mother, Doris Smith, his older sister, Nell Murray, and his younger sister, Patricia Smith, as respondents.[169] Because Dr. Swanson determined that Smith's mother did not have the 4th or 6th grade reading ability required for the ABAS-II, that assessment was given to the sisters only.[170]   Dr. Swanson testified that she does between twenty-five and forty retrospective assessments per month and that approximately twelve per year involve persons who previously had not been diagnosed as mentally retarded.[171]

Dr. Swanson also testified that she did consider malingering, the possibility that the family members would try to portray Smith as more impaired than he really was.   She interviewed the three separately[172] and used two different measures for two of them,  in order to check for inter-relater as well as cross-relater reliability.[173]   She acknowledged that the use of the ABAS-II and VABS-II  in retrospective assessments is controversial,  and agreed with other experts in the

---

[168]"Very often, these respondents are parents, older siblings, other family members, teachers, employers, and friends."  AAIDD 11TH EDITION at 47.

[169]Rec. Doc. 1583 at 132-33; Deft. Exh. 1 at 3-4.

[170]Rec. Doc. 1583 at 131; Deft. Exh. 1 at 3-4.

[171]Rec. Doc. 1583 at 127-28.

[172]This was also confirmed by Tanzanika Ruffin, the defense paralegal who was present when the interviews took place and confirmed that each was done separately.  Rec. Doc. 1586 at 833-35.

[173]Rec. Doc. 1583 at 195-96.

field that the results should be interpreted with caution.[174]   She also testified that she had asked the defense team to find other reporters, such as teachers, coaches, employers, but that effort was unsuccessful because Smith was over fifty years old at the time of the offense.[175]

An evaluation using the VABS-II involves an interview format and provides standardized scores in four areas or domains of adaptive functioning, communication, daily living, socialization, and motor skills, as well as an overall standardized score, called the Adaptive Behavior Composite (ABC).   Based on family members' responses, Dr. Swanson calculated the VABS-II scores for Smith at age 17 as follows:[176]

---

[174]Rec. Doc. 1583 at 245-47.

[175]*Id.* at 234-37.

[176]Deft. Exh. 1 at 3-4

|  | Mother | | Patricia | | Nell | |
|---|---|---|---|---|---|---|
| Age | 17-0-0 | | 17-0-0 | | 17-0-0 | |
| Domains/Subdomains | SS | Level | SS | Level | SS | Level |
| Communication | 64 | Mild | 63 | Mild | 67 | Severe |
|   Receptive Language | | Low | | Low | | Low |
|   Expressive Language | | Low | | Low | | Moderately Low |
|   Written Language | | Low | | Low | | Low |
| Daily Living | 69 | Mild | 68 | Mild | 69 | Mild |
|   Personal | | Low | | Low | | Low |
|   Domestic | | Low | | Moderately Low | | Low |
|   Community | | Adequate | | Moderately Low | | Adequate |
| Socialization | 63 | Mild | 60 | Mild | 64 | Mild |
|   Interpersonal Relations | | Low | | Low | | Moderately Low |
|   Play & Leisure Time | | Low | | Low | | Low |
|   Coping Skills | | Low | | Low | | Low |
| Motor Skills | 100 | Adequate | 100 | Adequate | 100 | Adequate |
|   Gross Motor Skills | | Adequate | | Adequate | | Adequate |
|   Fine Motor Skills | | Adequate | | Adequate | | Adequate |
| ABC | 63 | Mild | 62 | Mild | 64 | Mild |

The ABAS-II provides standardized scores in three adaptive domains, Conceptual, Social and Practical Skills, that correspond to the AAMR/AAIDD and DSM-IV-TR specifications, and also provides an overall estimate of adaptive functioning with a Generalized Adaptive Composite ("GAC") standard score, with a mean of 100 and standard deviation of 15.  Dr. Swanson calculated Smith's ABAS-II Composite Scores

for his level of adaptive behavior at age 17 as follows:[177]

|  | Patricia | | Nell | |
| --- | --- | --- | --- | --- |
| **ABAS-II Composite Scores** | **Standard Score** | **Level** | **Standard Score** | **Level** |
| **Conceptual** | 63 | Mild | 69 | Mild |
| **Social** | 66 | Mild | 68 | Mild |
| **Practical** | 63 | Mild | 75 | Moderately Low |
| **GAC** | 58 | Mild | 63 | Mild |

Smith's adaptive functioning at age 17 in the ABAS-II skill areas indicate the

following with a mean of 10 and standard deviation of 3, according to Dr. Swanson:

|  | Patricia | | | Nell | | |
| --- | --- | --- | --- | --- | --- | --- |
| **ABAS - II Skill Areas** | **Scaled Scores** | **Level in SDs** | **Range** | **Scaled Scores** | **Level in SDs** | **Range** |
| **Communication** | 3 | -2.33 | Low | 4 | -2.00 | Low |
| **Community Use** | 4 | -2.00 | Low | 6 | -1.33 | Moderately Low |
| **Functional Academics** | 3 | -2.33 | Low | 6 | -1.33 | Moderately Low |
| **Home Living** | 4 | -2.00 | Low | 5 | -1.67 | Moderately Low |
| **Health & Safety** | 4 | -2.00 | Low | 5 | -1.67 | Moderately Low |
| **Leisure** | 3 | -2.33 | Low | 4 | -2.00 | Low |
| **Self-Care** | 2 | -2.67 | Low | 5 | -1.67 | Moderately Low |
| **Self-Direction** | 4 | -2.00 | Low | 3 | -2.33 | Low |
| **Social** | 4 | -2.00 | Low | 4 | -2.00 | Low |

---

[177]*Id.* at 4.

Based on the scores, Dr. Swanson found cognitive impairment prior to the age of 18, that constituted Mild Mental Retardation.[178] More specifically, she found "substantial limitations in the areas of self-care, understanding and use of language, learning, self-direction, capacity for independent living, and economic self-sufficiency with evidence of onset prior to the age of 18."[179]

Dr. Swanson testified that she found the final test scores reliable for a number of reasons. The scores from the respondents did not vary beyond one standard deviation or 15 points, as required for statistical purposes and inter-relator reliability.[180] In fact, the VABS-II scores deviated no more than *four* points between the respondents,[181] and in several instances the scores were identical or varied by only one point.

Because of Dr. Hayes' criticism, the Court undertook an independent examination the VABS-II responses to evaluate consistency on individual questions. For each question, four responses were possible: (2) usually performs the behavior independently; (1) sometimes performs the behavior independently; (0) never performs the behavior independently and (4) don't know. Of the nearly one hundred fifty (150) questions that all three respondents answered, 72% of their answers were the same. Of the remainder, usually two scores were identical with

---

[178]Rec. Doc. 1583 at 222.

[179]Deft. Exh. 1 at 5; Rec. Doc. 1583 at 223.

[180]Rec. Doc. 1583 at 135-36.

[181]The widest discrepancy was Patricia's score of 60 in Socialization compared to Nell's score of 64.

a one level difference for the third.   Dora and Nell's scores were identical for 88%

of their answers; Dora and Patricia's scores were identical for 77% of their answers

and Nell and Patricia were likewise identical for 77% of their answers.   Again,

where a discrepancy occurred, it was usually no more than one ranking.   A two

point discrepancy between the three scorers occurred only about a dozen times, or

about 8% of the total, and even in those instances, two of the respondents usually

concurred on a score, with the third being the outlier.   This consistency strongly

supports the reliability of the tests and the conclusion that the respondents were not

deliberately exaggerating his deficits.   Since none of the three women had ever

been asked these specific questions before, they had no opportunity to conspire in

advance to answer in the same way, yet their answers were in fact strikingly

consistent.   Furthermore, a significant majority of the scores for all three  was

category "2," which indicated the person could perform the function independently

most of the time.   Were they attempting to exaggerate his deficits, the results

would likely have not been so positive on so many questions.   Indeed, the adaptive

behavior scores on the three VABS-II, which ranged from 63 to 69, mirrored

Smith's IQ assessment of 67, without correction for the Flynn Effect.[182]

Dr. Swanson testified that the ABAS-II data was also fairly consistent within

the respondent, across the domains and between respondents.[183]   The Court

likewise found that on the ABAS-II, approximately 54% of the answers Patricia

---

[182]Rec. Doc. 1584 at 377.

[183]Rec. Doc. 1583 at 136-37.

and Nell gave were identical, approximately 43% were a one level difference and only 3% more than one level.

As already noted, Dr. Swanson's "conclusion, based on these adaptive instruments, was that there was strong evidence to indicate that prior to the age of 18 there were adaptive deficits."[50]

### iii.      Questions re: Dora Smith's Credibility

The government raised a serious challenge to the credibility of Smith's mother, Dora, based on a taped prison telephone conversation between Smith and his mother on February 24, 2008.   In this conversation, Dora Smith indicated her willingness to lie on the stand at an upcoming hearing, on the advice of Smith's lawyer, Steven Lemoine,  who she believed wanted to argue that Smith was "cuckoo."[51]   Dora Smith stated that Lemoine told her several times he was "for Joseph," not wanting to lose the case by lethal injection, which Dora Smith construed as "[t]hat's as good as to tell us we got to lie on the thing, you know." She said that "whatever he tells that whats me to say, I'm saying it you know." The disclosure of this recording caused the first *Atkins* hearing in this matter to be canceled on March 6, 2008, in open court.[52]   The telephone call began with a

---

[50]*Id.* at 138, 222.

[51]Govt. Exh. 43 at 5-7 (2-24-08).

[52]Rec. Doc. 756.

recorded caution that "[t]his call is subject to monitoring and recording."[53]

Dr. Swanson administered the VABS-II to Dora Smith in May 2006, almost two years *before* the "advice" from Lemoine to lie at the upcoming hearing, which diminishes some of the impact the conversation with Lemoine may have had with respect to Dora Smith's previous answers on the VABS-II, despite the disturbing references to toilet training issues both in those answers and during the recorded conversation. Dr. Swanson testified that she reevaluated everything after hearing the taped telephone conversation and concluded her original opinion was still valid.[54] As already discussed, Dora Smith's VABS-II scores were very consistent with the two other respondents. Nevertheless, the Court remains troubled by this conversation and, in an abundance of caution, will set aside the VABS-III administered to Dora Smith and assess whether the evidence was sufficient without it to find Smith to have sufficient deficits to warrant a finding of Mild Mental Retardation.

The Court begins that process by observing that Dr. Swanson testified that she had adequate data to give the same opinion even if the VABS-II of Smith's mother was totally disregarded.[55] With respect to the remaining scores, specifically Patricia and Nell's VABS-II scores and both of their ABAS-II scores, the Court finds them to be valid, consistent and reliable.

---

[53]Govt. Exh. 43 at 1(2-24-08).

[54]Rec. Doc. 1583 at 61-64, 259.

[55]Rec. Doc. 1584 at 402-03.

*iv.*    *Criticism of Dr. Swanson's VABS-II and ABAS-II Scores*

A.    Norming

The government argues that Dr. Swanson did not norm the tests for Smith at age 17.   Both the VABS-II and ABAS-II can be normed back to that age.[56]  Dr. Swanson testified that she normed the scores for Smith at age 17 years.  Identifying the age is important as the same data yields a different adaptive behavior score at different chronological ages.[57]   These differences are logical since adaptive behavior is learned over a period of time.  A person who cannot consistently do certain things at age 17, that his same aged peers can do, such as make a bed, or cook a simple meal, or follow basic instructions, might have a score in the mildly mentally retarded range, but if he still had not learned to do those things by age 45, his score would be even lower.

Dr. Swanson testified that she sent Dr. Gouvier, at his request, the full raw scores on the VABS-II and that the data was normed at 55 years, Smith's true age at the time.[58]  Dr. Gouvier was the neuropsychologist assessing Smith for possible brain damage.[59]   Dr. Swanson repeatedly explained that the data was provided to

---

[56]*Id.* at 334.

[57]*Id.* at 340.

[58]*Id.* at 341-43.  The record is unclear as to whether Dr. Gouvier requested only the raw data, and the calculations based on age 55 were sent as well, or whether he requested the calculations at 55 as well.

[59]*Id*. at 343.

Dr. Gouvier for that different purpose and that she simply gave him what he requested.[60]   The Court is satisfied with this explanation.

The government also challenged certain erasure marks by Dr. Swanson on the original VABS-II and ABAS-II forms, claiming they indicated that the respondents were answering the questions at Smith's current chronological age. Dr. Swanson had originally written in pencil Smith's then-current age of 55 on the forms.   She readily agreed that she later erased that number and put in 17-0-0.[61] Dr. Swanson explained that at the time she gave the assessments,  she logged in his chronological age, as she had routinely done in the past.   Subsequently, she attended a number of conferences on how to handle *Atkins* issues, and learned that she needed to make clear on the face of the protocol what *norms* were being used. That information caused her to change the age on the forms to reflect that they were *normed* at 17-0-0.[62]

Most importantly, Dr. Swanson testified several times that she clearly instructed each of the respondents to answer the questions as if Smith were 17 years old.[63]   This is supported by the testimony of Tanzanika Ruffin, who was the

---

[60]*Id.* at 337-38, 342-43; 348-50.  The Court also rejects the government's suggestion that Patricia and Nell, by affirmatively answering questions on the ABAS-II about Smith's employment, must have answering as if he were 55 years old.  *Id.* at 347.   Even Dr. Hayes conceded that Smith had odd jobs as a teenager. *Id.* at 477.  At the time Patricia and Nell completed the ABAS-II, however, Smith had been incarcerated several years and was obviously not employed.

[61]*Id.* at 354-58.

[62]*Id.* at 361-63.

[63]*Id.* at 363-66; Rec. Doc. 1585 at 593-94.

defense paralegal assigned to talk with the family members regarding mitigation, who testified that she told the family members they would be meeting with Dr. Swanson who wanted to "talk to them about Joseph's past."[64] The Court is likewise satisfied that each respondent was properly instructed.

Dr. Swanson also acknowledged that she initially entered the scores into the computer to be calculated at Smith's chronological age of 55, and when the computer generated the figures, she realized the mistake and corrected it by changing the norm to age 17.[65]  The Court finds that this explanation likewise satisfactory and credible, rendiering the initial mistake a nonissue.

Dr. Hayes testified as to four reasons why it did not appear to her that the ABAS-II and VABS-II assessments were normed at age 17 years and that they should have been re-done.[66]   First, she noted that Dr. Swanson herself admitted she initially entered his scores based on age 55, which placed Smith in the severe range of mental retardation and apparently alerted Dr. Swanson to correct her obvious error in entering the wrong age.[67]   Dr. Hayes' second reason for concluding the respondents were not answering the questions as if Smith were 17 years old was because they answered questions regarding checking accounts, and

---

[64]Rec. Doc. 1586 at 833, 839-41.

[65]Rec. Doc. 1584 at 366-67.

[66]*Id.* at 418, 584-85.

[67]*Id.* at 419.

signing business forms and leases.[68]  However, Dr. Swanson instructed each respondent that even if the person had not had the opportunity yet to perform the behavior, they were still to estimate, based on his abilities, whether they thought he had the capacity to do it.[69]   Both Patricia and Nell answered  "never" on Smith's capacity to handle a checking account responsibly or manage his own money through checks or money orders.[70]   On the ABAS-II, which is self-administered, Nell answered "sometimes" to Smith's ability to complete a form for business, such as a lease, and Patricia answered "never."[71]    In addition to Dr. Swanson's verbal instructions, the protocol of the ABAS-II itself states in bold letters: "Please read and answer ALL items."[72]   Patricia and Nell were doing what they were instructed to do by both Dr. Swanson and the protocol in providing answers to all the questions.  However, their skepticism about their brother's capacity to complete a business form, such as a lease, was evident.   Dr. Hayes' third basis for her conclusion that Patricia and Nell assessed their brother at his current age was because Patricia and Nell completed the work section of the ABAS-II which they

---

[68]Rec. Doc. 1585 at 568-69, 584.

[69]Rec. Doc. 1583 at 207; Rec. Doc. 1584 at 369.

[70]Deft. Exh. 1B at 69 (VABS-II Item 37, 41), 111 (same items).   While the Court has, in an abundance of caution, chosen to disregard Dora Smith's VABS-II in determining whether a finding of Mild Mental Retardation is appropriate, the Court does note that she likewise answered "never" to the same items.  Deft. Exh. 1B at 39.

[71]*Id.* at 91 (Item 23), 134 (same item).

[72]*Id.* at 88 (emphasis original).

should not have, as he had not worked full-time.[73]   Again, the Court notes that this is a self-administered test and the protocol instructs the respondent to answer "ALL" questions, and the particular protocol on work mentions full *or* part-time employment.[74]   Dr. Hayes was aware that Smith had odd jobs as a teenager.[75]   As the final reason why Dr. Hayes testified that she  believed the data was normed at age 55 was because Dr. Swanson sent to Dr. Gouvier the raw data and the scores, normed at 55, which has already been discussed.

The Court finds Dr. Hayes' criticisms to be largely speculative and non-expert in nature.  The Court agrees the erasures and initial norming errors raised legitimate concerns about the validity of the scores, but Dr. Swanson's explanation put those concerns to rest.   In fact, Dr. Hayes acknowledged that the tests, if normed at 55, would indicate that Smith was either profoundly or severely retarded.[76]   No one asserts that.  On the other hand, she also agreed that if the respondents did answer honestly regarding Smith's capacities at the age of 17, that the results correctly showed he was in the mild mental retardation range.[77]

The Court concludes that Dr. Swanson properly instructed all three respondents to answer the questions from the perspective of Smith at the age of 17,

---

[73]Rec. Doc. 1585 at 588-89; Rec. Doc. 1584 at 367.

[74]Deft. Exh. 1B at 96, 138.

[75]Rec. Doc. 1584 at 477.

[76]Rec. Doc. 1585 at 589.

[77]*Id.* at 589-91.

as she repeatedly testified.   The results themselves are the proof in the pudding since they placed Smith in a range consistent with his IQ scores.   The Court finds it inconceivable that  Dr. Swanson, with her extensive history of administering thousands of these tests,  would suddenly "forget" that the third criteria is onset prior to the age of 18,  particularly in such a high-stakes capital case.

### B.   Bias and Inconsistent Answers

In her report, Dr. Hayes challenges the choice of family members as respondents, because of their vested interest in the outcome.[78]   Dr. Swanson readily acknowledged that all three family members had an interest in the outcome.[79]   She testified that she took steps to address this by separately interviewing the respondents and administering two separate instruments to assess inter-respondent reliability.[80]  The Court has already set forth its own findings of the remarkable consistency in answers across all three respondents on the VABS-II and the two respondents on the ABAS-II.   Since none of the women had any advance notice of what questions they were to be asked, their identical responses to the vast majority of the questions supports their honesty and reliability.   Also, as already pointed out, had any of the three wished to deliberately downplay Smith's

---

[78]Govt. Exh. 42 at 19-20.

[79]Rec. Doc. 1583 at 229.

[80]*Id.* at 195-96.   Dr. Hayes acknowledged that there are no malingering tests for adaptive assessments.  Rec. Doc. 1585 at 575.

capacities, they would not have given him the highest score on the majority of the questions, as they did.   Likewise, had even one of them deliberately exaggerated his disabilities,  it would have shown in a marked deviation from the other two.

Most of Dr. Hayes' and the government's criticism was focused on the minority of answers where some discrepancy existed between the respondents. Since hundreds of questions are involved in the VABS-II and ABAS-II, a significant amount of time at the hearing was spent on isolated questions where answers varied.   The Court finds such variances to be insignificant except to indicate that each of the respondents had their own unique perspective on Smith as he was growing up.   The Court has already highlighted the remarkable similarity in answers between all respondents, despite their different perspectives, and agrees with Dr. Swanson in this regard.  Moreover, with so many questions being asked, the issue is whether the outcome is statistically consistent, not whether an answer varied on a particular question.[81]   However, because of the extended attention spent on these alleged discrepancies, they are addressed in " Appendix A," attached to this opinion.


4.  Dr. Hayes' Adaptive Functioning Assessment


Dr. Hayes' opinion as to adaptive functioning was based on a similar

---

[81]Rec. Doc. 1583 at 132.

documentary data set as Dr. Swanson's opinion along with Dr. Hayes' semi-structured interview of Smith.[82]   Dr. Hayes testified she asked to interview the same family members that Dr. Swanson interviewed and was told that would not be possible, although it was unclear who told her that.[83]   She did not speak to any of Smith's prior employers nor any of his friends.  She said she tried to locate school personnel from the 1970's but was told no one from that period was available.[84]   Again, this is not surprising, considering Smith's age at the time of the offense.

### i.   Discipline Issues Unrelated to Mental Deficits

Dr. Hayes testified that much of Smith's difficulties were the result of behavioral misconduct rather than indicative of mental deficits.   For example, she cited his truancy from school as likely to be a behavioral deficit rather than an academic deficit.[85]   She noted that Smith's work records included references to failing to follow instructions, being tardy or not showing up at all, and insubordination, which she said could be lack of self-direction but also simply antisocial behavior.[86]   Dr. Hayes likewise attributed Smith's failure to complete the

---

[82]Govt. Exh. 42 at 16.

[83]Rec. Doc. 1584 at 545-46.

[84]*Id.* at 546, 547.

[85]*Id.* at 465.

[86]*Id.* at 472-73.

Job Corps program as a "discipline" issue rather than inability to do the work.[87] Finally, she asserted that Smith's failures in the U.S. Navy were unrelated to mental retardation, but instead were again discipline issues.[88]   As will be discussed later in this opinion, the Court finds that all of these so-called behavior problems are equally consistent with a person with Mild Mental Retardation.

### ii.   *Clinical Interview*

Dr. Hayes testified that Smith did not "present himself as a person with mental retardation" during the February 22, 2008, interview.[89]   She acknowledged some mildly retarded people can hide their deficits, but said she is trained to be alert to that circumstance.   She claimed to have looked for evidence of mental retardation during the lengthy interview, however, the only stated  "deficit" she discerned was that Smith was not up to date on current events.[90]   Citing other sources, she concluded he was not good with grammar, spelling, or math.[91]   Her report catalogued a series of Smith's alleged strengths rather than any deficits.[92] She testified, for example,  that Smith "absolutely" had a "sophisticated

---

[87]*Id.* at 479-80.

[88]*Id.* at 485.

[89]*Id.* at 459.

[90]*Id.* at 458-59.

[91]*Id.* at 459, 466.

[92]Govt. Exh. 42 at 27-44.

vocabulary."[93]   The Court agrees that one of Smith's strengths is that he has learned several specific sophisticated words, such as "colleague," "counteracting," "ultimatum," "speculating," and  "forfeited."

The first noticeable aspect of the lengthy video is how slowly Smith answered questions, and how often he had to pause before answering.[94]  The Court discovered that his responses were so slow that the recording could actually be accelerated to a higher speed during the second viewing, with his responses then resembling what this Court considers a more normal conversational pace.

Dr. Cunningham testified that Dr. Hayes went into the interview with an assumption that Smith had intact intellect, and she did not adjust when his responses indicated otherwise.[95]   Dr. Cunningham based this opinion on a number of her interview techniques.  First, while he noted she took an extensive history from Smith, obtaining a great deal of objective factual data, she did not explore issues that would show whether he had cognitive deficits.   The Court agrees.   For example, Dr. Hayes asked Smith to name the places where he had lived over the years, what jobs he had, and the names of his various siblings, but she did not question him about how he arranged for his lodgings, or how he found jobs, or how he managed his finances, or how he perceived various relationships, both familial and otherwise, other than to elicit the response that he was close to his

---

[93]Rec. Doc. 1584 at 459.

[94]*See also* Rec. Doc. 1583 at 73.

[95]Rec. Doc. 1585 at 644.

mother.[96]

Another reason Dr. Cunningham opined that Dr. Hayes assumed Smith's intellect to be normal was her use of multi-part compound questions.[97]   The Court again agrees that many of the questions would be difficult for a person with normal intelligence to answer.  Dr. Cunningham illustrated this observation with reference to a portion of the video interview in which Dr. Hayes told Smith that, with reference to everyone in his family, she wanted to know their names, how old they are, when they were born, what their relationship was to him, what they did for a living, whether they had any mental health problems, or medical problems or substance abuse problems, and whether they had ever been jailed.[98]  She then said, "Let's...start off with...your mama and daddy, tell me about them."[99]  He responded, "[w]hat do you want to know?"[100]   The compound question had clearly gone over his head.[101]  Eventually Dr. Hayes provided Smith with a "cheat-sheet" to remind him of the different data she wanted.[102]   In her report,  Dr. Hayes made

---

[96]*Id.* at 644-46; Deft. Exh. 5 at 18-19;  Deft. Exh. 12 at 56.

[97]Rec. Doc. 1585 at 646.

[98]Deft. Exh. 5 at 8.

[99]*Id.*

[100]*Id.*

[101]Rec. Doc. 1585 at 646-47; Deft. Exh. 5 at 8.  Other examples were given by Dr. Cunningham.  Rec. Doc. 1585 at 647-49.  *See also* Deft. Exh. 5 at 40-42.

[102]Rec. Doc. 1585 at 648-49, 660-61; Deft. Exh. 5 at 21, 112.

no mention of Smith's difficulties with responding to these questions.[103]   Instead, she testified that he was a "good conversationalist."[104]  Dr. Swanson, on the other hand, testified persuasively that when she asked Smith something, she would break it down into simple steps, using simple language, and would ask it in more ways than one, to make sure he understood.[105]   Dr. Hayes did not  employ those precautions.

A further shortcoming of the interview, according to Dr. Cunningham and with which the Court agrees, was Dr. Hayes' failure to acknowledge Smith's lack of conciseness and clarity in some of his explanations, indicating disorganized thought.[106]  At one point, Smith said that he liked to play marbles when he was a child.[107]   Dr. Hayes appropriately asked him to explain how the game is played. What followed was a  convoluted description by Smith, with Dr. Hayes repeatedly asking him additional questions because the explanation was so unclear.[108]   At the *Atkins* hearing, however,  Dr. Hayes testified simply that Smith "gave her a fairly

---

[103]Rec. Doc. 1585 at 649.

[104]Rec. Doc. 1584 at 458, 649.

[105]Rec. Doc. 1583 at 255.

[106]Rec. Doc. 1585 at 655.

[107]Deft. Exh. 5 at 46-48.

[108]*Id.* at 46-48.   As Dr. Cunningham noted, "it takes him three pages to say you thumb one of your marbles at the ones that are in the ring and if it knocks it out you get to take that marble and you keep shooting until you miss."  Rec. Doc. 1585 at 657.

good description of how to play marbles."[109] This was similar to Dr. Hayes'
truncated rendition of whether Smith was able to define a "ship" already discussed
under the IQ section of this opinion.[110]  A similarly jumbled explanation came
when Smith was asked to explain welding and welding tools, which finally ended
when Dr. Thompson stepped in to explain what Smith could not.[111]  The Court
agrees with Dr. Cunningham that Smith's description of the one job he had
intermittently for about eight years was "surprisingly disorganized."[112]  This is not
mentioned in Dr. Hayes' accounting.   On the other hand, Dr. Hayes did make a
point of noting the things Smith was able to explain well, such as crawfishing,
cleaning a bathtub, cooking smothered chicken and making a roux.[113]

A significant criticism of Dr. Hayes' interview technique according to Dr.
Cunningham, with which the Court also agrees, is that she failed to explore deficits
that Smith himself clearly acknowledged.[114]  For example, Smith volunteered he
had difficulty with English, spelling and math when he was in the Job Corps and as
a result did not complete the program.[115]  Instead of probing to find out what

---

[109]Rec. Doc. 1584 at 470.

[110]Deft. Exh. 5 at 182.

[111]*Id.* at 93-97.

[112]Rec. Doc. 1585 at 752.

[113]Rec. Doc. 1584 at 462, 467; Deft. Exh. 5 at 82-83.

[114]Rec. Doc. 1585 at 661-62; Deft. Exh. 12 at 86-87.

[115]Deft Exh. 5 at 66.

specifically he was struggling with, which would be relevant to the Functional Academics prong of an adaptive behavior assessment,  Dr. Hayes only asked if he nonetheless received a certificate for welding, which he did not.[116]   Similarly, Smith relayed to Dr. Hayes a litany of problems he had in boot camp in the U.S. Navy with academic testing and "cloth folding,"  relevant to Functional Academics and Daily Living Skills, respectively, but she only asked him how long it took him it took him to complete boot camp.[117]  She also failed to investigate his determination to stay in the Navy despite all these difficulties.[118]

The Court finds some of Dr. Cunningham's criticisms were not well-founded.  Dr. Cunningham criticized Dr. Hayes for using words that Smith did not appear to understand, but the Court found that Smith's answers were reasonably responsive to the questions, indicating he did understand.[119]  Likewise, Dr. Cunningham claimed that Dr. Hayes ignored deficits in Smith's specific knowledge, such as not knowing the name of a pill he was taking, when his father died or his father's age at his death, how far his parents went in school, and the

---

[116]*Id.* at 66.

[117]*Id.* at 67-68.

[118]*Id.* at 69.

[119]Dr. Hayes asked Smith if his father had "mental health problems or any difficulties with his nerves" and Smith related that his father and mother used to fight a lot. *Id.* at 10.  Later, Dr. Hayes asked Smith if his mother had any mental health problems and specifically mentioned depression.  Smith responded that his mother did some things she probably was not proud of, specifically infidelity. *Id.* at 15-16.  Dr. Cunningham found these answers nonresponsive.  The Court disagrees.

year of the birth of his numerous siblings, among other gaps in his memory.[120] The Court, on the other hand, finds these gaps in specific knowledge to be normal and unremarkable, and not indicative of any relevant deficit.

Overall, the Court finds most of Dr. Cunningham's criticisms to be well-taken.  In addition, the Court found other examples that even in the Court's admittedly lay opinion indicated cognitive problems that were unmentioned in Dr. Hayes' report and her testimony.   A discussion of them is incorporated into "Appendix B," attached to this opinion.

The Court concludes that Dr. Hayes, whether consciously or unconsciously, participated in the interview with a predisposition to find Smith not cognitively impaired.   She overlooked significant indicators of deficits, while highlighting only his strengths.  As a result, her report and testimony drawn from the interview did not give a full, accurate picture of Smith's mental abilities.   This may reflect her relative inexperience in the mental retardation field, having only performed about 10 formal adaptive behavior evaluations in her career.   As Dr. Swanson testified, Mild Mental Retardation is "one of the most difficult areas to diagnose."[121]

### iii.   Use of Correctional Officers as Respondents

Dr. Hayes had various correctional officers, at the jail where Smith was

---

[120]Rec. Doc. 1585 at 654; Deft. Exh. 12 at 72-73.

[121]Rec. Doc. 1530, tab 3 at 617; Rec. Doc. 1536.

housed,  fill out the ABAS-II with respect to Smith's adaptive functioning.  She acknowledged that their contact with Smith was limited, but nonetheless provided extensive examples of specific behavior of Smith purportedly observed by the officers.[122]  Two correctional employees, Dr. Arthur Mauterer and Deputy Bobby Magee, both of the Tangipahoa Parish Jail, also testified at the *Atkins* hearing.

Dr. Swanson testified that the authors of the ABAS-II strongly recommend against using correctional officers as respondents.   According to her, the primary reason is that adaptive behavior is supposed to be assessed in a "real community" where the person has to make his own choices, as opposed to a structured prison setting, where much of the inmate's daily life is scheduled by the institutional staff.[123]   As stated in *Hardy*, "An institutional environment of any kind necessarily provides 'hidden supports' whereby the inmates are told when to get up, when to eat, when to bathe, and their movements are highly restricted."  *Hardy*, 762 F.Supp.2d at 900.  Dr. Swanson cited as an example the various prison forms provided to inmates, including forms for commissary items and forms to request medical attention.  Included in the exhibits, for example, is a request by Smith for medical attention.[124]   It asks for the inmate's name, location, various identifying data, date and time of the request and then provides two lines for "Nature of Complaint."   Once filled out and turned in, the complaint is assessed by the

---

[122]Govt. Exh. 42 at 28-43.

[123]Rec. Doc. 1583 at 217-18; Rec. Doc. 1584 at 399-400.

[124]Govt. Exh. 27.

medical personnel and action is taken, such as providing medicine to the inmate. As Dr. Swanson testified, this procedure is far different than someone sitting at home with a medical problem and trying to figure out what to do about it.[125]   Yet it is the latter environment that is relevant to an evaluation of adaptive behavior. "Some experts have argued in court that the structure and routine of prison life are well suited to many people with mental retardation and that they can become model prisoners and indistinguishable from the average inmate."[126]   Dr. Hayes in her own listing of Smith's observed behaviors noted a number of examples of his ready acquiescence to the prison structure.[127]

Dr. Swanson also testified that correctional officers do not have the type of continuous contact with the offender that a caregiver would have, getting to know him well over a long period of time.  They are there to enforce incarceration.[128]

---

[125]Rec. Doc. 1583 at 220; Rec. Doc. 1585 at 691-95. The same is true of the commissary form which lists numerous items inmates can order divided into categories with the prices listed.  Govt. Exh.  52.   All the inmate has to do is fill in the dots corresponding to what they want and turn the form in.  Rec. Doc. 1585 at 699-703.

[126]J. Gregory Olley, *The Assessment of Adaptive Behavior in Adult Forensic Cases: Part 1,* PSYCHOL. IN MENTAL RETARDATION & DEV'L DISABILITIES, Vol. 32, No. 1at 3 (2006); Govt. Art. 2 at 3; Rec. Doc. 1584 at 400.

[127]Govt. Exh. 42 at 31:"Correctional officers noted Mr. Smith reads and obeys signs....Mr. Smith follows the jail schedule without complaint;"*id.* at 42: "Correctional officers noted that when requested to do so, he stops whatever activity he is doing and goes to his cell without displaying any anger or untoward behavior."

[128]Rec. Doc. 1584 at 400-01.

They are also not trained to make assessments of adaptive behavior.[129]  This is particularly relevant since Smith is a person who is not alleged to even be moderately mentally retarded, but only mildly mentally retarded, and persons with Mild Mental Retardation "are generally able to fulfill all expected adult roles, "[130] and "[w]ith appropriate supports...can usually live successfully in the community, either independently or in supervised settings."[131]   These individuals often "pass" in the community, meaning neither their appearance or demeanor immediately cause others to be aware of their deficits.  *Hardy,* 762 F.Supp.2d at 902.   For example, Dr. Mauterer of the Tangipahoa Parish Jail testified about what jail officials did with "severely impaired" inmates, and he did not recall Smith being "tagged as anything other than normal."[132]   In this case, the several psychologists, who *are* trained in making such assessments, disagree on what Smith's adaptive capabilities are.   Prison guards can hardly be expected to be able to make that determination.  Furthermore,  as was noted in *Hardy*, "prison officers' observations are limited to an extremely unusual set of circumstances, and are likely to be filtered through their experience with other prisoners, many of whom may also suffer from intellectual limitations."   *Hardy*, 762 F.Supp.2d at 900.   A further shortcoming relating to the use of prison personnel as respondents is the bias they

---

[129]Rec. Doc. 1583 at 219.

[130]APA MANUAL at 17–18.

[131]DSM-IV-TR at 43.

[132]Rec. Doc. 1585 at 695-96.

might have, as law enforcement officers, against a criminal, a bias which Dr. Hayes acknowledged was "certainly possible."[138]

A final difficulty with the use of correctional officers as respondents is the fact that they are observing Smith in his 50's and not at age 17, which is the age focused upon by Smith's family members with Dr. Swanson and is the age relevant to an assessment of mental retardation. The important issue of *when* a skill is learned is ignored by the use of these correctional officers as respondents. The mildly mentally retarded tellingly used to be labeled "educable,"[139] meaning skills could in fact be learned, eventually. Dr. Swanson testified that seeing a strength in a person as an adult is insufficient without answers as to when he learned it, whether it was contemporaneous with same-age peers, how long it took to learn it and how much support had to be provided. "Not seeing a deficit at 26 doesn't mean maybe there wasn't a deficit earlier developmentally..."[140] Likewise, seeing strengths at 55 or older, does not mean that relevant deficits were not present during the developmental period.

Dr. Hayes agreed with Dr. Swanson that the authors of the ABAS-II indicate that it should not be used in a correctional setting, but testified that she still "used it as a guide for an interview and to make summary statements."[141] Dr. Hayes

---

[138]Rec. Doc. 1584 at 541.

[139]DSM-IV-TR at 43.

[140]Rec. Doc. 1530, Tab 5 at 624, 667; Rec. Doc. 1536.

[141]Rec. Doc. 1584 at 543-44.

provided a long list of observed behaviors by the correctional officers as support for the finding that Smith is not mentally retarded.[142]   Persons with Mild Mental Retardation clearly have strengths as well as weaknesses, allowing most of them to live in society.[143]   As Dr. Swanson persuasively testified , many of the behaviors Dr. Hayes listed are well within the capabilities of a person with Mild Mental Retardation, particularly someone with Smith's verbal ability.[144]   In *Wiley,* the state argued that the defendant could not be found to be mentally retarded because he "often provided money to help pay household bills, possessed skill repairing vehicles and frequently helped friends and neighbors with auto repairs, provided transportation for others, volunteered for military service, and was a reliable worker who quit school to go to work to provide for his family."  *Wiley,* 625 F.3d at 217. The Fifth Circuit rejected that argument, noting that several of the expert witnesses testified that mentally retarded people can in fact perform all of those functions.

The vast majority of Dr. Hayes' findings regarding the correctional officers' observations of Smith's behavior fall into the category of behaviors that a mildly mentally retarded person can readily perform, and therefore are irrelevant to the ultimate determination here.   A significant portion of the remaining behaviors are those which the penal institution itself provides substantial structure and support,

---

[142]Govt. Exh. 42.

[143]AAIDD 11TH EDITION at 7; AAMR 10TH EDITION AT 13; USER'S GUIDE at 3.

[144]Rec. Doc. 1583 at 221.

hence, are not indicative of how Smith would have functioned in the community at large, which is the only relevant environment.   Those observations are likewise irrelevant to the issue presented.   Finally, the correctional officers are simply not qualified to assess an additional number of reported observed behaviors as being either within or outside the range of mental retardation.  Those observations must also be disregarded.  Those specific behaviors and which of the three categories the Court concludes they fall are listed in "Appendix C," attached to this opinion.


     *iv.*   *Drug Use and Brain Injury/ Truancy*

Dr. Hayes also suggested that Smith's poor adaptive behavior and intellectual functioning throughout his life was caused or affected by his drug use.[145]   Smith admitted to abusing drugs since the approximate age of 10, when he began sniffing glue.[146]   Dr. Hayes candidly admits that "[t]he literature is emerging in the area, and it appears that neuropsychological functioning appears to be impaired when individuals are intoxicated and/or are regularly using heroin," but that "[w]hat is unclear is the long-term impact of heroin dependence on intellectual functioning following a significant period of sobriety (i.e., years vs. months)."[147]

Again, Dr. Gouvier examined Smith for neuropsychological problems

---

[145]Rec. Doc. 1584 at 516.

[146]*Id.* at 346, 440, 489; Govt. Exh. 42 at 27, 45.

[147]Govt. Exh. 42 at 27.

relative to drug abuse and brain injury, and did not testify.  According to Dr. Swanson, however, Dr. Gouvier did not find brain injury in relation to substance abuse by Smith.[148]

Smith indicated to Dr. Hayes that it was not until after his service in the Navy that he became involved with drugs heavier than marijuana, and more specifically, heroin.[149]   By his own admission, Smith went through periods of heroin addiction and sobriety.[150]   On at least one occasion, he lost potential employment at a shipyard because he failed the drug test.[151]   Smith also said that when he was off the drugs, his mind would return to normal.[152]

By virtue of the evaluation by Dr. Gouvier, the possibility of brain injury from drug use was considered, yet no evidence of its existence was actually presented at the hearing either by the defense or the government.   As a result, the suggestion that Smith's adaptive deficits, or intellectual functioning, were caused or diminished by drugs and were not developmental in nature is entirely speculative.

> 5.   School, Job Corps, U.S. Navy, Employment Records

---

[148]Rec. Doc. 1583 at 143.

[149]Deft. Exh. 5 at 116-21, 163-66.

[150]*Id.* at 167-68.

[151]*Id.* at 129-30.

[152]*Id.* at 169.

The next task relevant to the assessment of adaptive behavior involves a review of school, work and other records for data that can corroborate or refute a finding of Mild Mental Retardation.[153]

### i. Elementary and High School

Smith attended Murray Henderson Elementary School in New Orleans.[154] No records were introduced from that particular school, so the only available information comes from Smith's self-report to Dr. Hayes contained in the videoed interview lasting over five hours.[155]   The Court has viewed the interview on several occasions and finds Smith to have been forthcoming and credible.   Dr. Hayes also testified that she found him cooperative and consistent in what he told her.[156]

Smith stated that he entered Henderson at six years old, failed 1st grade and was held back a year.[157]   He told Dr. Hayes that he regularly attended "special classes" for students who were "slower" and that he needed the extra help.[158]   He

---

[153]Some of these facts were referenced with regard to the Court's finding of significant subaverage intellectual functioning.  They are discussed here in connection with the second prong of the mental retardation test, substantial deficits in adaptive behavior.

[154]Deft. Exh. 6.

[155]Govt. Exh. 42.

[156]Rec. Doc. 1584 at 501, 511-12.

[157]Deft. Exh. 5 at 86-87260-61.   This is substantiated by the fact that Smith ultimately graduated from high school at the age of 20, after repeating the 12th grade as well.  Deft. Exh. 6 at 361, 362, 367.

[158]Deft. Exh. 5 at 84-85.

attended these special classes throughout most of elementary school.[159]   He

specified problems with reading and spelling.[160]

After 6th grade at Henderson, Smith attended L. B. Landry, which was a

combined junior and senior high school.[161]   He testified that Landry did not have

special classes.  When asked by Dr. Hayes how he performed at Landry, he said:

> I had trouble in school, I...I was always...it was hard for me...to
> learn...I was slow.  I needed...I needed extra help...the teachers would,
> I mean, the classes were so big and, you know, the teachers would
> give you instructions and it was one time instruction, if you didn't get
> it you was on your own, if you needed somebody to help you...or...test
> time come.[162]

> I always had difficulties with...school period, you know, from, you
> know, I was always...I was always slow about comprehending,...you
> know, I would have to, in order for me to be able to...to pass certain
> tests I would need extra time or help or...yes.[163]

Smith stated that while he did not fail any other full grades, he did fail

specific courses, like English and math.   He was able to pass in "hands-on" type

classes, like wood making and the metal shop.[164]

Smith did nevertheless graduate from Landry High School in 1971 at the age

---

[159]*Id.* at 85-86.

[160]*Id.* at 86.

[161]*Id.* at 86.

[162]*Id.* at 87.

[163]*Id.* at 87.

[164]*Id.* at 87.

of 20.[165]   To pass a class at Landry, the student had to achieve a minimum score of

70.[166]  Smith's overall average was 70.89, which was barely passing and placing

him 159th out of a class of 174, 15th from the bottom of the class.[167]

While Smith did not officially fail any other grade besides 1st grade, he did

technically fail the 7th grade but was nonetheless promoted to the 8th grade.   His 7th

grade report card shows that he failed by scoring less than 70 in math, two reading

classes and music.   He had a barely passing grade of 70 in English and a 71 for

physical education.   His final overall average for that year was a below passing

67.[168]  School records also show that Smith was heading to failure in 12th grade

before he dropped out of Landry in late March, 1970.  His overall average when he

withdrew was a 63.[169]

Smith eventually did graduate from Landry.  The fact that he did so despite a

significant number of days being absent or tardy,[170] was "remarkable" according to

Dr. Swanson's testimony.[171]  His scores were barely passing, raising the question

naturally whether a student with Mild Mental Retardation could have achieved

---

[165]Deft. Exh. 6 at 367.

[166]*Id.* at 370 (bottom).

[167]*Id.* at 367.

[168]*Id.* at 368.

[169]*Id.* at 361.

[170]*Id.* at 368, 369, 361-62.

[171]Rec. Doc. 1584 at 328.

these grades.  Dr. Hayes testified that it was "possible" but not "probable."[172]

Smith's younger sister, Patricia, told Dr. Swanson that she helped Smith with his homework when he was in high school.[173]   Even though Patricia was still in elementary school, and Smith was in high school at the time, Dr. Swanson surmised that Smith was functioning at a grade school level, comparable to Patricia.[174] Smith likewise told Dr. Swanson that his siblings helped him with schoolwork and that friends would let him cheat off of their exams.[175]  Even assuming he had such assistance, his scores were not good.

Other evidence indicates that Landry was not a school that challenged its students.  After Smith dropped out of the 12th grade, at the age of 19, he joined Job Corps.  As part of their admission process, he was academically tested.  He scored at the 3.1 grade level in reading and 4.3 grade level in math.[176]   He ultimately left the Job Corps and returned to Landry in 1970 to repeat the 12th grade, this time successfully.[177]   Dr. Cunningham noted that for someone with a 3rd grade reading

---

[172]*Id.* at 441.

[173]*Id.* at 313, 382.

[174]*Id.* at 382-83.

[175]Deft. Exh. 1 at 1.

[176]Deft. Exh. 7 at 436.

[177]Smith attended four of the six grading periods of 12th grade at Landry in 1969-70, with some days absent, before withdrawing.  He subsequently attended 12th grade in Compton, California, for some period of time, before returning to Landry.  Deft. Exh. 5 at 120.  Therefore, when he returned to Landry he had had a

level to then graduate from the 12th grade of a high school, all while missing many classes, "speaks volumes about the nature of what a high school graduation means from that high school."[178]   Dr. Hayes likewise conceded that his having graduated despite all his absences could indicate "how bad the school was."[179]

Dr. Hayes cited a number of studies involving just African-American adults that showed they scored very poorly on various literacy type tests,[180] the point being presumably that not all these poor performers were in fact mentally retarded.[181] That is undoubtedly true, of course, but more significantly, the various studies cited by Dr. Hayes are illustrative of the poor quality of education that these African-Americans received from the public school system.  The Court agrees with Dr. Cunningham that the studies illustrate a pattern of social promotion or a watered-down curriculum which allowed those with 3rd or 4th grade literacy to continue to advance.[182]   In fact, when asked specifically if she found it anomalous that someone could graduate high school when his actual achievement level is at the  3rd grade

---

lot of experience with the 12th grade.

[178]Rec. Doc. 1585 at 669.  Dr. Swanson testified, based on information from one of the Landry 7th grade teachers at the time, that 7th grade math consisted primarily of only addition, subtraction, multiplication, division, indicating a watered-down curriculum.  Rec. Doc. 1584 at 329-30.

[179]Rec. Doc. 1584 at 441.

[180]*Id.* at 434-39.

[181]*Id.* at 439.

[182]Rec. Doc. 1585 at 669.

level, Dr. Hayes said it would be "unusual but it's not that unusual." She cited police officers that she has screened who read at the 3rd grade level, and even some students in junior college who read at that level.[183]   At a minimum, Dr. Hayes had to concede, in light of what she was saying, that one interpretation of Smith's successful graduation is that he was simply socially promoted, without really earning the degree.[184]

When Smith was in the 7th grade, he took the Metropolitan Achievement Test.[185]   Unfortunately, it is not known whether his comparative scores were national, statewide or citywide.   Dr. Swanson speculated that they were citywide, as his scores were higher than she would have expected,[186] considering that he actually failed 7th grade although promoted, and considering also his Otis Beta IQ scores the same year, which placed him in the mildly mentally retarded range.[187] Nevertheless, she testified that his score at the 1st percentile in spelling and the 2nd

---

[183]*Id.* at 567.

[184]*Id.* at 567.   Dr. Hayes also presented data showing graduation rates from high schools in Louisiana a few years after Smith graduated.  It showed that roughly two-thirds of students graduated, placing Smith at better than a third of the students starting in high school.  Rec. Doc.1584 at 442-43.  She acknowledged these were statewide statistics, that she had no information on Landry itself, its graduation rate, nor its social promotion policy.  *Id.* at 552-53.

[185]Deft. Exh. 6 at 363.

[186]Dr. Swanson indicated that the citywide norms are the least competitive of the three sets of norms, so his rankings would be inflated as a result, as compared to a national norm.  In *Hardy*, Dr. Hayes acknowledged the same phenomena with respect to another similar achievement test.  762 F.Supp.2d at 908.

[187]Rec. Doc. 1583 at 94-95, 323-24.

percentile in language are consistent with Mild Mental Retardation, and that the three scores in the 3rd percentile (word knowledge, reading and language study skills) were also quite low.  At the same time, Smith did better in arithmetic, scoring in the 21st and 24th percentiles respectively in those categories.  Dr. Swanson stated that these records, including standardized scores and grades, supported a finding that his Functional Academic skills were low.[188]

Dr. Hayes likewise cited the Metropolitan Achievement Test scores.  She again made a questionable conversion of those scores to an IQ score.   Smith's highest score was in the 5th percentile, which she analogized to an IQ of 75.[189]   The Court does not consider it appropriate to compare a MAT score with an IQ score, but were the Court to use Dr. Hayes' analogy, then Smith would be in the Mild Mental Retardation range,  considering the standard error of measurement.   It is also noteworthy that Smith scored in the 5th  percentile in only two of the seven Metropolitan Achievement tests - in the other five his scores were lower which would clearly place him in the mildly retarded range, again using her own analysis.

An arguably more accurate assessment of Smith's knowledge was Dr. Gouvier's administration of the Test of Adolescent and Adult Language ("TOAL-

---

[188] *Id.* at 139.   Functional Academics is one of the subscore categories cited by the APA.  DSM-IV-TR at 49.  These records have already been discussed with regard to the Court's finding of significant subaverage intellectual functioning. The records are found to be equally supportive of subaverage functioning with regard to any overlapping adaptive functioning domain.

[189]Rec. Doc. 1584 at 433.

3") to Smith in May 2007.   Smith's scores were below the 1st percentile in three categories: speaking, reading and writing grammar, at the 1st percentile in listening and writing vocabulary, at the  2nd percentile in speaking vocabulary, at the 9th percentile in listening grammar and at the 25th percentile in reading vocabulary, providing the only relatively positive score.[190]

The Court concludes that Smith's school records, plus Dr. Gouvier's TOAL-3 testing, are consistent with a diagnosis of Mild Mental Retardation.   The DSM-IV-TR states that mildly mentally retarded individuals can acquire academic skills up to about the 6th grade level[191] and the APA's Division 33 similarly states that for the mildly mentally retarded, "(r)eading and numbers skills will range from 1st to 6th grade level."[192]   Smith appears to have peaked at around the 5th grade level.[193]   The Court also finds that Smith's graduation from Landry High School failed to establish that he achieved, in fact, a 12th grade education.   Rather, the evidence instead supports the finding that Landry had an anemic curriculum and a practice of social promotion, which masked the deficits and academic shortcomings of its students.

Other factors support the finding of Mild Mental Retardation.   Smith showed

---

[190]Rec. Doc. 1583 at 140-41.

[191]DSM-IV-TR at 43.

[192]APA MANUAL at 17-19.

[193]Deft. Exh. 7 at 436; Rec. Doc. 1583 at 80-81, 382-83.

determination to complete his schooling, despite his marginal grades and periodic setbacks.   Even after dropping out of Landry, and then dropping out of the Job Corps program, he nonetheless returned to Landry in the fall of 1970 and graduated as the age of 20 in 1971.[194]   The Court concludes that Smith's struggles were not through lack of effort.  He persisted in trying to achieve, but consistently fell short. The most plausible explanation is simple lack of ability to compete at the levels he sought.   He would repeat this pattern later in the Job Corps, in the U.S. Navy and in his work history.

In addition, despite his difficulties with school, Smith indicated he got along with the other students and teachers,[195] and other than absences and tardiness, his school records do not indicate otherwise.  While he did not get the academic help he truly needed, school was an environment that provided at least some structure that aided his progress.  As the DSM-IV-TR advises, persons with Mild Mental Retardation can succeed "(w)ith appropriate supports."[196]

Smith also recounted to Dr. Hayes an experience of allowing himself to be sexually molested by a homosexual algebra teacher, Mr. Richardson, in the 11th grade, in exchange for a better grade.[197]   While Dr. Hayes expressed some

---

[194]*See also* Rec. Doc. 1584 at 327.

[195]Deft. Exh. 5 at 88.

[196]DSM-IV-TR at 43.

[197]Deft. Exh. 5 at 98.

skepticism over whether this occurred,[198] it is difficult to imagine Smith making up such an event.   Smith would have been 18 years old at the time.  According to the AAIDD 11ᵀᴴ EDITION, persons with intellectual disabilities "typically have a strong acquiescence bias or a bias to please that might lead to erroneous patterns of responding."[199]  His report card for that algebra class shows he was failing until the 6th grading period, which showed a spike to a startling score of 90, lending further support to his recollection of molestation.[200]   The score of 90 allowed him to pass the class for the semester.

Finally, Smith did not participate in any extracurricular activities, was not involved in athletics or clubs, and received no honors or awards.[201]   As the Supreme Court noted in *Atkins*, mentally retarded people "in group settings...are followers rather than leaders." *Atkins*, 536 U.S. at 318.

All things considered, the Court finds, by a preponderance of the evidence, that all the data from Smith's elementary, middle and high school career support a finding of Mild Mental Retardation.

---

[198]Rec. Doc. 1584 at 553-54.  Dr. Swanson testified to having reviewed an affidavit from another teacher who was at the school at that time and confirmed that Mr. Richardson was rumored to be involved in such behavior with other students.  *Id.* at 330.  The Court considers this reliable corroborative information, despite its hearsay nature.

[199]AAIDD, 11ᵀᴴ EDITION at 51-52.

[200]Deft. Exh. 6 at 361.

[201]Deft. Exh. 5 at 88-89.

*ii.   Job Corps*

In March 1970, when he was 19 years old, Smith enrolled in the Job Corps.[202] As already noted, he was academically tested and scored at the 3.1 grade level in reading, and at the 4.3 grade level in math.  His records indicated he could add, subtract, multiply and divide whole numbers and that "[h]is progress, attendance, and attitude are good, except in math where his progress and attendance are poor."[203]   Dr. Swanson's math probes with Smith yielded results consistent with a math capability at the 4th grade level, indicating Smith had not advanced in the ensuing decades.[204]

Smith studied welding while in the Job Corps.  His progress was slow at best. The Job Corps evaluated corpsmen by a three code system.  "Level L" was "Limited Skill," which was described as able to do simple tasks but needing instruction or supervision for more complex tasks.  "Level M" was "Moderate Skill," which was described as able to competently perform with limited supervision but still may need help on more complicated tasks.  "Level S" is "Skilled," which is defined as able to work independently and meet the demands of speed and accuracy on the job.[205]   In the 33 welding categories in which Smith was

---

[202]Deft. Exh. 7 at 386.

[203]*Id.* at 436.

[204]Rec. Doc. 1583 at 80-81.

[205]Deft. Exh. 7 at 387.

rated, after 114 hours of training, Smith scored an "S" in none.  Most of his scores were at the "L" or lowest level, the remainder at "M."[206]   Dr. Swanson found that this record supported her conclusion as to poor adaptive functioning regarding Work Skills.[207]

   Smith told Dr. Swanson that he dropped out of the Job Corps because he could not meet the academic requirements.[208]   Apparently part of the program, since he had not graduated high school, was to attend G.E.D. classes.  Smith told Dr. Hayes that he could not pass math, English and spelling, so he did not finish the program.[209]   Smith also had attendance and attention problems.   He was assessed demerits on several occasions for sleeping in class, or not showing up for class at all, including one absence because he was in jail.[210]  Dr. Swanson testified that this sort of irresponsible behavior is consistent with Mild Mental Retardation: "there are certain things we may not do well when we're 13 or 14, but it's expected in our culture that by the time we enter adulthood, we understand the importance of these things and we start doing them.  And he had not understood – he was not doing

---

[206]*Id.*; *see also* Rec. Doc. 1583 at 110.

[207]Rec. Doc. 1583 at 109-11.   Work Skills are a subscore category of the APA's list of adaptive behaviors relevant to a diagnosis of mental retardation. DSM-IV-TR at 41.

[208]Rec. Doc. 1584 at 320.

[209]Deft. Exh. 7 at 436, box 24; Deft. Exh. 5 at 66.

[210]Deft. Exh. 7 at 400-04.

them at that point..."[211]

The Court concludes that Smith's Job Corps experience is consistent with a person with Mild Mental Retardation.   He entered the program at 19 years of age, performing only at a 3rd and 4th  grade level.  He began with a good attitude and effort, but was slow to master even the basics of welding, needing additional instruction and supervision.  He also struggled with the academic requirements of the G.E.D. program.   Eventually, he  stopped regularly attending class and was administratively discharged.

This was a pattern that repeated itself again when, after high school graduation,  Smith entered the U.S. Navy.


*ii.  U.S. Navy*

Joseph Smith enlisted in the Navy in July, 1971.   As part of the qualification process he took a number of tests.   Smith told Dr. Hayes that the recruiter gave him a multiple choice test, which he thought he failed three times before finally passing.[212]  Perhaps this was the initial test, the Armed Forces Qualification Test.

---

[211]Rec. Doc. 1584 at 388.

[212]Deft. Exh. 5 at 67.   Dr. Hayes did not find that Smith malingered or "dummied down" during her lengthy interview with him.   She testified that she did not catch him in any lies, that his responses were consistent with his history, and what she thought were his expected levels of functioning.  Rec. Doc. 1584 at 511-12.  The Court has likewise viewed the entire recorded interview and finds, as already noted, Smith to be cooperative and candid in his responses.

According to Dr. Hayes, that test is a measure of general ability and covers verbal ability, arithmetic reasoning, spatial relations and tool functions.[213]  When Smith finally passed, he scored in the 17th percentile on that test, indicating that 83% of the people taking the test scored better than he did.[214]

Dr. Swanson testified that the military divided potential inductees into five categories, with the fifth being those who score in the 1st to 9th percentile and are not admitted.[215]  Dr. Hayes concurred.[216]  Dr. Cunningham testified that Smith fell into the fourth category which would be consistent with an intellect at least in the borderline range, with intellectual abilities significantly deficient as compared to the other servicemen.[217]

The Navy Applicant Qualification Test, according to Dr. Hayes, measures vocabulary, arithmetic and spatial relations.[218]  Smith's score was in the 28th percentile on that test, indicating that 72% of the Navy applicants did better than him.

The General Classification Test, according to Dr. Hayes, consists of verbal

---

[213]Govt. Exh. 42 at 22.

[214]Govt. Exh. 4.

[215]Rec. Doc. 1583 at 152.

[216]Rec. Doc. 1584 at 557.

[217]Rec. Doc. 1585 at 760-62.

[218]Govt. Exh. 42 at 22.

analogies and sentence completion items.[219]   As already noted in the earlier section on IQ,  Dr. Swanson testified that the GCT is not an IQ test but it does highly correlate with IQ scores.[220]   Dr. Swanson testified that the mean of the test is 50 (as compared to 100 for an IQ test), with a standard deviation ranging from 7.5 to 10, depending on which the military was using at the time.  This would place Smith's score at least one "and probably two"  standard deviations below the mean.[221]  Two standard deviations below the mean on an IQ test is in the Mild Mental Retardation range.  Dr. Swanson also noted that Smith's score on a separate arithmetic test was a 39, which was also low.[222]   The military records themselves rank the scores on the GCT and the arithmetic score from 1-5, with 1 being high, 3 being average and 5 being low.   Smith's GCT score of 5 was at the bottom rung or "low," and his arithmetic score of 4 was "below average."[223]

In Dr. Hayes' expert report, she declared that none of Smith's military test scores were in "the mentally retarded range," as if *all* the tests purported to measure IQ, which even she had to concede they did not.[224]   While the GCT  result appears to be the only one arguably analogous to an IQ score,  Dr.  Hayes not only

---

[219]*Id.*

[220]Rec. Doc. 1583 at 150, 153.

[221]*Id.* at 150-51.

[222]*Id.* at 150-51.

[223]Govt. Exh. 6.

[224]Rec. Doc. 1584 at 445.

converted that score to an IQ score of 75, but took the highly questionable step of analogizing *all* of Smith's military test scores to IQ tests.[225]   She testified that Smith's 17% percentile rank on the Armed Forces Qualification Test "equated...on the same metric as an IQ of 100" as comparable to an IQ of 85 or 86, and that his score on the Navy Applicant Qualification Test was similarly analogous to an IQ of 91 or 92.[226]   She even converted his score on a Sonar Pitch Memory Test into an IQ of 91 and a Radio Code Aptitude Test into an IQ of 94.[227]   No testimony was presented at all as to how any of these particular tests in fact correlate with IQ, if any do at all.   Indeed, it is difficult to fathom how a sonar pitch memory test can be a measure of innate intelligence, other than peripherally on the quality of one's memory.   On cross-examination, Dr. Hayes backtracked from saying she "inferred" an IQ result from the sonar test, claimed that she was not declaring his IQ was 91, but she was simply reporting "data" and a "standard score."[228]   She also conceded that she had not actually seen any of these military tests, hence did not know their content, and did not know what the mean or standard deviation or margin of error was on any of the tests.[229]   Noteworthy too is that those enlisting in the military may not be representative of the entire population and the range of intellectual ability.

---

[225]*Id.* at 443-45.

[226]*Id.* at 443.

[227]*Id.* at 444-45.

[228]*Id.* at 554-57.

[229]*Id.* at 556-57.

The Court finds Dr. Hayes' casual comparisons of these various military tests to an "IQ" to be highly inappropriate, misleading and unscientifically based, hence, unworthy of any credence.

Once in the military, Smith immediately began to have difficulties.   He related to Dr.  Swanson that he failed the first boot camp in part because he did not master bed-making, failed the second boot camp in part because he did not store his clothes correctly or appear properly in uniform and failed the third boot camp because of academics.[230]  He relayed likewise to Dr. Hayes that he failed basic training three times.[231]   One of the tests he failed was clothes folding and the Navy eventually put him in a clothes folding company "so I was able to get that down."[232] He still struggled with the "school part."[233]   Smith and another sailor were having difficulty with the written tests, so another sailor helped them with a study guide and finally Smith was able to pass the academic test and graduate from boot camp.[234]  Smith estimated it took him as long as "like, two, well, four, two, three, three, four months or something" to make it through boot camp, which, according to

---

[230]Rec. Doc. 1583 at 154.

[231]Deft. Exh. 5 at 67.

[232]*Id.* at 67-68.

[233]*Id.* at 67.

[234]*Id.* at 68.

Smith, ordinarily takes six to eight weeks.[235]   The Navy at that point even offered

to release him from military, with benefits, but he wanted to stay in the Navy.[236]

Dr. Swanson observed how  motivated Smith had to have been to stay in the Navy

despite all these initial and frustrating setbacks.[237]

He then went to Tennessee for Fleet Preparatory School but, in October 1971,

failed to advance to AIRMAN because he did not successfully complete all the

requirements of AIRMAN/BMR.[238]   In March 1972, he was evaluated for the first

time and received a below average mark in Professional Performance on the basis

that he "is content to follow and not to exert any individual attention to a project at

hand."[239]   Again, mentally retarded individuals are "followers rather than leaders."

*Atkins*, 536 U.S. at 318.

Smith did however, in the same month, become qualified as a Plane

---

[235]*Id.* at 67-68.   It took Smith slightly less than three months to complete boot camp.  Govt. Exh. 7 at 22.

[236]Deft. Exh. 5 at 68-69.

[237]Rec. Doc. 1583 at 154-55.

[238]Govt. Exh. 7 at 21; Deft. Exh. 5 at 69.   There appears to be a contradiction in the records as Govt. Exh. 7 at 47 indicates Smith received a mark of "Satisfactory" and graduated from Aviation Fleet Preparatory Class in October 1971.  Dr. Hayes in fact cited this in her report as an indication that Smith was "inconsistently" reporting his history.  Govt. Exh. 42 at 19.  Dr. Swanson surmised that he passed the four week requirement but not with a high enough score to move up a grade.  Rec. Doc. 1583 at 155.  Smith graduated but was still not able to advance to a higher level.  Hence he was not being inconsistent in what he told Dr. Hayes.

[239]Govt. Exh. 7 at 20.

Captain.[240]   Dr. Hayes researched what that entailed and surmised that he worked

on exterior aircraft maintenance, although not on the actual mechanics of the

plane.[241]  Smith himself told Dr. Hayes that he checked the planes for fuel leaks,

checked the tires and put the ladder up for the pilot to climb aboard and then "hook

him up."[242]

Over the succeeding months, Smith had recurring problems with simple and

basic responsibilities–such as showing up on time for his assigned duties,[243] and

staying awake when he was on duty.[244]  This was a recurrence of the problems he

experienced in the Job Corps.   In September 1972, he received a below average

mark of 2.0 in Military Behavior on the basis that even though he was a well

qualified plane captain, "he lacks motivation, initiative, and confidence."[245]   The

report also criticized Smith for being disinterested in his daily tasks, flaunting

authority and being unwilling to accept his responsibilities.  Slightly over a month

later, he received below average marks in Professional Performance and

Adaptability for being continuously late to work, with little or no excuse, for taking

the easiest method of completing his assigned tasks and needing constant reminders

---

[240]*Id.* at 19.

[241]Rec. Doc. 1584 at 483.

[242]Deft. Exh. 5 at 89-90, 000263-64.

[243]Govt. Exh. 7 at 19; *see also id.* at 18, 35, 40.

[244]*Id.* at 37.

[245]*Id.* at 18.

of the job to be done.[246]  His negative attitude towards the military was also noted.[247] It appears at that point he was demoted as well to an inferior pay grade and rank, losing his Plane Captain status.[248]

Smith did apparently have one brief hiatus where he performed well, through the direct intervention of a Navy Boatswain Mate Chief Glen Patton.  Patton was aware of Smith's disciplinary problems and requested that Smith work in his squadron as a compartment cleaner, apparently around September 1972.[249]  Smith worked for Patton for around three months.  Obviously Patton was supportive, providing structure and accommodation.  Smith responded in a positive way, doing his job well, creating no problems and significantly improving his attitude.[250]

One of Smith's diversions when he was in the U.S. Navy was gambling, specifically shooting dice.   He would let the losers borrow from him until the next payday, but charged a quarter for every dollar borrowed.   While the government characterized this as earning 25% interest per week, Smith simply explained it as receiving a quarter on the dollar.[251]   Dr. Hayes and Dr. Swanson understood the

---

[246]*Id.* at 17.

[247]*Id.*

[248]*Id.* at 40; *see also* Rec. Doc. 1583 at 146-47.

[249]Govt. Exh. 7 at 83.

[250]*Id.*

[251]Deft. Exh. 5 at 71.

arrangement the same way.[252]   Dr. Swanson opined that he did not have the math

skills to understand the concept of interest but he did have enough skills to

concretely determine what he was owed.   He would do so apparently by laying out

the money, dollar by dollar, with a quarter alongside each one.[253]   While the Court

concurs that Smith did not have the math skills to comprehend interest rates, it was

a strength of his that he was able to create his own method to keep track of what he

was owed.

One of the debts he was owed ultimately led to his discharge from the U.S.

Navy.   Someone failed to pay Smith back the money owed from gambling, so

Smith stole the stereo system from his room.[254]  He was charged with both wrongful

appropriation and threatening the same person with harm and was convicted of the

first charge, acquitted of the second.   Based on this final straw, so to speak, Smith

was then processed out of the Navy for "Unfitness" but with an Honorable

Discharge.[255]   He was not recommended for reenlistment.[256]

According to Dr. Swanson, the U.S. Navy records were consistent with a

person who has Mild Mental Retardation and consistent with his demonstrated

---

[252]Rec. Doc. 1584 at 412, 270.

[253]Rec. Doc. 1583 at 271.

[254]Deft. Exh. 5 at 71-72.

[255]Govt. Exh. 3.

[256]Govt. Exh. 7 at 14.

Functional Academic Skills.[257]   The Court agrees.   Dr. Swanson noted Smith's

extended stay in boot camp, and how the skills he was having difficulty mastering,

at 20 years old, were basic practical Self-Care Skills–making a bed, keeping your

clothes clean, neat and folded.[258]   In addition to these deficits, he consistently

struggled with the academic requirements.   As Dr. Swanson testified, a mildly

mentally retarded person can eventually master a skill, but needs more repetitions,

taking a longer period of time to do so.[259]   She also cited the October 1972, critique

from Smith's superior officer for arriving to work late, having to be reminded to get

to work and taking the easiest way to complete a task, all of which, according to Dr.

Swanson, were relevant to deficient adaptive behavior receptive skills, the ability to

understand and to follow instructions.[260]

Dr. Hayes, on the other hand, concluded that Smith's difficulties were not

related to mental retardation, noting that one supervisor indicated he was a well-

qualified Plane Captain.[261]   However, as she herself determined, being a Plane

Captain did not involve difficult tasks.   His tenure as a Plane Captain was not a

long one before he was demoted to a lesser grade.   Dr. Hayes also pointed out that

Smith completed a defensive driving course and portable fire extinguisher training.

---

[257]Rec. Doc. 1583 at 175-76.

[258]*Id.* at 85-86;  Deft. Exh. 1 at 1.

[259]Rec. Doc. 1584 at 389.

[260]Rec. Doc. 1583 at 145-46.

[261]Rec. Doc. 1584 at 485.

The Court notes that the each training lasted only one day, indicating a rudimentary class, not difficult to complete.[262]   Smith's former Navy attorney, Howard Abbott, testified at the *Atkins* hearing that Smith's low GCT/ARI score would have limited the jobs he could strive for in the Navy and that what ultimately happened to him in the Navy was in keeping with those scores.[263]

The Court concludes that  Smith's military failures are more indicative of Mild Mental Retardation than simply discipline issues.  His repeated failure to pass even the initial examination, his low marks on the GCT test, and his having to repeat boot camp three times for not mastering basic domestic and self-care skills, all indicate an initially motivated person who simply could not make the grade.  His failures began to mount and he eventually turned hostile to the entire military experience, with the exception of working for several months under Boatswain Patton, who took the initiative of bringing Smith into his squadron and may have provided him with encouragement.   This underscores that Smith had the desire to succeed, but simply could not absent significant supports.   Even at the end of his service, he fought a dishonorable discharge and, ironically, it was an argument by his attorney that Smith had "limited capability to make value judgments as indicated by his low GCT/ARI scores" that may have won him his general discharge under

---

[262]Govt. Exh. 7 at 26.

[263]Rec. Doc. 1586 at 810.

honorable conditions.[264]

One final issue regarding Smith's military career needs to be addressed, which is the typed letter he signed in connection with his Navy discharge process.[265] His attorney at the time, Howard Abbott, testified that he had no specific recollection of the Smith representation.[266] However, Abbott testified that most of his clients opted not to have a formal hearing and at most to submit written documentation in their favor.[267] He would instruct the client to also go and prepare his own statement, in his own words, and bring it back.[268] Abbott would not change the substance of the statement, other than correcting punctuation and possibly spelling.[269]

Dr. Swanson testified that Smith told her that someone helped him write the letter and that he did not do it himself.[270] Dr. Hayes testified that this letter would need a 9th grade education to be able to read and understand.[271] She conceded that

---

[264]Govt. Exh. 7 at 82.

[265]Govt. Exh. 5.

[266]Rec. Doc. 1586 at 780, 796.

[267]*Id.* at 781-83.

[268]*Id*. at 784-85.

[269]*Id*. at 786-87.

[270]Rec. Doc. 1583 at 156.

[271]Rec. Doc. 1585 at 565-66, 571-72; Govt. Exh. 42 at 24.

someone could have assisted Smith with the draft.[272]

Having assistance appears to be the only realistic explanation for the letter. When Smith was in the Job Corps, roughly a year before his enlistment, his reading level was determined to be at the 3rd grade level.[273]  When he was incarcerated in the Texas Department of Corrections in 1977, several years after his Navy discharge, he tested at the 5th grade level.[274]  It is implausible to believe that he went from a 3rd grade level in 1970 to a highly unlikely 9th grade level a year later than back to a 5th grade level several years after that.[275]  The Court concludes that Smith had assistance in drafting the letter, even if it did not come from Abbott.

The Court finds Smith's experience in the U.S. Navy, from his initial test experiences through his difficulties in graduating from boot camp, his lack of success in advancing up the ranks and his ultimate failure at basic responsible behavior, are all characteristic of person with Mild Mental Retardation.  As with his other earlier endeavors, Smith began motivated to succeed, but then became increasingly disillusioned as he fell further behind from meeting any goals.

iv.  *Employment History*

---

[272]Rec. Doc. 1585 at 566.

[273]Deft. Exh. 7 at 436.

[274]Govt. Exh. 9; Rec. Doc. 1585 at 564-65.

[275]*See also* Rec. Doc. 1585 at 670-71.

According to Dr. Swanson, persons with Mild Mental Retardation can in fact have long work careers and be very productive, albeit at menial jobs.[276]   A person's work history can be systematically assessed to determine if it is consistent with a person who is mildly retarded.  The relevant factors include:  how many jobs the person has had, how frequently he changed jobs, who helped him find the jobs, what the wages were,  how menial were the tasks and how the work compared with those of same age peers.[277]

Smith reported to Dr. Hayes that after he left the U. S. Navy, he worked for several months at a supermarket.  He bagged groceries, stocked shelves, cleaned floors and at times took inventory, which consisted of counting the canned goods.[278]

In spring of 1977, Smith was convicted of robbery and sent to the Texas Department of Corrections.[279]   His job classification was as a "Laborer" and he tested at the 5.2 grade level.[280]   In the fall of that year, he took a Business Law class provided in prison by Lee College and received a "D" as a grade.[281]   In the summer

---

[276]Rec. Doc. 1583 at 163.

[277]*Id.* at 163, 173-74.

[278]Deft. Exh. 5 at 113.

[279]Govt. Exh. 11 at 5-6, 9.

[280]*Id.* at 13.

[281]Deft. Exh. 6 at 380B.

of 1978, he signed up for several welding classes, receiving "C"s in three of the classes and withdrawing from the other two.[282]   Dr. Cunningham surmised that since these classes were given in prison, the courses were likely not as demanding as they would be in the open community.[283]

Smith told Dr. Hayes that when he left prison, he went to Houston Community College for several months for a refresher course on welding, which may have taught the same skills that he purportedly studied in prison.[284]   In any event, he did not complete any of the classes and withdrew.[285]

Smith reported that after prison he got a job as a welder in Houston, working about a year although he conceded he was an "absentee somewhat."[286]   He next went to a Brown & Root shipyard where it took him three attempts before he passed the weld construction test.[287]   This was, of course, after taking classes in welding in the Job Corps, through Lee College while in prison, and at Houston Community College.   He reportedly worked at Brown & Root for about eighteen months, was laid off, then hired on at another shipyard where he managed to pass the welding

---

[282]*Id.* at 380C.

[283]Rec. Doc. 1585 at 671.

[284]Deft. Exh. 5 at 91-92.

[285]Deft. Exh. 6 at 380A.

[286]Deft. Exh. 5 at 124.

[287]*Id.* at 125-26.

test the first time.[288]  His work recollection became hazy after that, although he did

relay several more welding jobs which all ended with his being laid off.[289]  He

worked at Avondale Shipyard at several different times, claiming to have made as

much as  $14 per hour.[290]  On one occasion he was fired for insubordination, after

arguing with his supervisor.[291]  On another occasion he was fired from a welding

job for taking a day off without calling in.[292]  Prior to being arrested on the current

charges, he was working for Labor Ready, a contracting company for general

laborers, and he was no longer welding.   He said he was on drugs and failed the

drug test at Bollinger Shipyard.[293]

Smith also reported to Dr. Hayes that he was taken advantage of by his

employer when he was allegedly hurt on the job while working for the Iron Union

Local 84 in Houston.   He stated that he was on a ladder which slipped, causing him

to fall and badly injure his wrist.   He said his co-workers encouraged him to get a

lawyer.   However, Smith said his employer "tricked" him by telling him that

workers' compensation did not pay much, and suggesting to him he continue to

---

[288]*Id*. at 126-27.

[289]*Id*. at 127-28, 130.

[290]This pay rate does not conform with the one provided in the work records
from Avondale.  Deft. Exh. 9 at 605.

[291]Deft. Exh. 5 at 129.

[292]*Id.* at 131.

[293]*Id.* at 130.

work instead, with the employer putting him on light duty.[294]   As noted earlier, according to the AAIDD 11TH EDITION, persons with intellectual disabilities "typically have a strong acquiescence bias or a bias to please that might lead to erroneous patterns of responding."[295]

When asked to explain by Dr. Hayes what he actually did as a welder, Smith was not able to articulate clearly how welding works.  He tried to explain how a structure is built, even standing up to demonstrate, but the explanation was obscure at best.  Likewise, when he was asked to explain what the welding tools were and how they functioned, he rambled through various terms, like a stamp, a chipping hammer, and a rosebud, without clarifying how any of them actually worked.   Dr. Hayes' colleague, Dr. Thompson, ultimately interrupted the recorded interview to provide the explanations.[296]

How good of a welder was Smith?   He identified himself as a "structural welder" and when Dr. Hayes asked if he advanced to other types of welding, he said "no."[297]   He also described what he did as "stick welding."[298]  Among the records from Avondale is a February 1988 memo to the "Welding/Tacking School"  to test

---

[294]*Id.* at 111-12.

[295]AAIDD, 11TH EDITION at 51-52.

[296]Deft. Exh. 5 at 93-97.

[297]*Id.* at 91, 93.

[298]*Id*. at 90-91.

and interview Smith for the position of welder.  Handwritten at the top is an "F" in a circle "welding test" and at the bottom left is a handwritten note, "tacker."[299]  This appears to indicate that he failed the welding test but was hired on in the lesser role of a tacker.[300]   This is actually confirmed by another of Avondale's records, which shows he was in fact hired in February 1988, but as a tacker, not a welder.[301]   The highest grade of tacker can spot tack, or small stick a weld but then the welder has to come in to finish it.[302]

In April 1992, Smith was again hired by Avondale, but again as a tacker and not a welder.[303]   In November 1996, Smith was again tested for the position of welder, and was hired on once again as a tacker.[304]   Significantly, Dr. Swanson testified that a program in Calcasieu Parish successfully trains mildly disabled individuals in these very same tacking skills, so they can work in the various plants in the area.   "The tacking skills are pretty easy to teach."[305]   Dr. Swanson surmised that Smith was a very good tacker.[306]   She also pointed that even as a welder, a

---

[299]Deft. Exh. 9 at 635.

[300]Rec. Doc. 1583 at 168.

[301]Deft. Exh. 9 at 605.

[302]Rec. Doc. 1583 at 169-70.

[303]Deft. Exh. 9 at 652-53.

[304]*Id.* at 656.

[305]Rec. Doc. 1583 at 169.

[306]*Id.* at 167.

person would be expected to not only pass the welding test, but also work at a production rate.  If doing one weld takes an inordinate amount of time, the person might be retained as a tacker, but not as a welder.[307]

In January 2001, Smith was hired as a welder, first class, by Avondale but was terminated within a few weeks for insubordination.[308]   This was the incident in which Smith reported having gotten into an argument with his supervisor.   A first class welder is someone who can independently weld all six types of welds.[309]   It appears from Smith's history that it is highly unlikely he ever achieved that level of competence.[310]

At Avondale, Smith's pay ranged from a little more than $5 per hour, as a tacker, to a little more than $10 per hour as a welder for a brief time before he was fired.[311]  Dr. Swanson surmised that he spent a total of eight years in various welding related jobs, but did not keep the jobs long at any one time.[312]  She pointed

---

[307]*Id.* at 165, 221.

[308]Deft. Exh. 9 at 629.

[309]Rec. Doc. 1583 at 172.

[310]Dr. Hayes in her report contends that Smith could operate "ARC, MIG and TIG welders," but no evidence was presented in support.  Govt. Exh. 42 at 46; Rec. Doc. 1584 at 467.  The evidence does show that Smith did enroll in a TIG MIG class while in prison, but withdrew before completing it and likewise signed up for ARC classes at Houston Community College and withdrew again.  Deft. Exh. 6 at 380A, 380C.

[311]Deft. Exh. 9 at 605.

[312]Rec. Doc. 1583 at 166.

out that he had started trying to learn welding when he was 19 years old, with additional training in prison and in junior college, but "he didn't have enough to maintain those skills – to maintain the job and keep a long job and move past the probationary period where they're moving you up."[313]   Dr. Cunningham concurred.[314]

In addition to the welding related positions, Smith also worked a number of menial level jobs.  He worked on a garbage truck, on a night crew cleaning restaurants, and for a catering service, with some of the jobs lasting just a few weeks.[315]   Dr. Hayes likewise observed that Smith did not hold a lot of jobs for a long period of time, but that at least he was successful in getting jobs.[316]

Dr. Swanson concluded that Smith's employment history is consistent with someone with Mild Mental Retardation.[317]   The Court agrees, and this finding is supported when the specific relevant factors are considered:[318]

1.  How many jobs did the person have?  In his thirty-five year working career, beginning in 1968 and ending in 2003, Smith worked almost fifty different

---

[313]*Id.* at 174.

[314]Rec. Doc. 1585 at 671.

[315]Rec. Doc. 1583 at 173-74.

[316]Rec. Doc. 1584 at 487.

[317]Rec. Doc. 1583 at 175.

[318]*Id.* at 163, 173-74.

jobs.[319]

2.  How frequently did he change jobs?   The longest Smith appeared to work at one time was eighteen months for Brown & Root.   Most of his jobs were less than a year, some only lasting a few weeks.[320]

3.  Who helped him find the jobs?   It would appear that Smith himself initiated his searches for jobs, which indicates to the Court again that he was motivated to work and his failures did not result from a lack of effort.  As Dr. Hayes noted, Smith was successful at getting jobs, but not at holding them very long.[321]

4.   What were the wages?  Smith never earned a significant amount of money.  His high was around $11,500 and in many jobs, his earnings were below $500.[322]

5.   How menial were the tasks?   Smith had many jobs which were menial, with his highest successful work being as a tacker.  As Dr. Swanson noted, persons with mental disabilities can in fact succeed as a tacker.[323]

6.  How did his work compare with same age peers?   Smith is an older offender, with a long work history.   However, he never achieved a level of success

---

[319]Deft. Exh. 9 at 508-18.

[320]*Id.*

[321]Rec. Doc. 1584 at 487.

[322]Deft. Exh. 9 at 508-17.

[323]Rec. Doc. 1583 at 169-70.

beyond menial work, and work consistent with the capabilities of someone with Mild Mental Retardation.

The Court finds that Smith's work history is consistent with a diagnosis of Mild Mental Retardation.

6.    The Court's Finding re: Smith's Adaptive Functioning

Assessing adaptive behavior, particularly using a retrospective diagnosis, and necessarily relying on persons who care for the defendant,  is fraught with difficulty, but it is also invariably necessary in an *Atkins* context.[324]  *Atkins*, 536 U.S. at 308, 317-18.

For the reasons stated above, the Court does not find Dr. Hayes' assessment to be reliably-based nor persuasive.   Her method of only interviewing the defendant and correctional officers presented a very narrow perspective on how Smith behaves now, in a structured environment, but offers little insight as to how he functioned during the developmental period in the larger community.

On the other hand, Dr. Swanson used formal instruments with two people who did know the defendant during the developmental period.[325]   Her administration of more than 10,000 adaptive behavior assessments over her long

---

[324]*See e.g., id.* at 229-50.

[325]As noted earlier, the Court considered the assessment without consideration of the results of the VABS-II administered to Dora Smith.

career attests to her expertise and the  consistency of the results confirms the validity of her findings.   Finally, the Court's own assessment of Smith's school records, military service and employment history supports her opinion.

The Court finds that the credible evidence establishes beyond a preponderance that Smith has significant impairments and concurrent deficits in adaptive functioning sufficient to diagnose him as mentally retarded with regard to the second prong of the AAMR/AAIDD and APA definitions.

### c.    Factor Three: Age of Onset

Since mental retardation is developmental, the final prong of the definition focuses on the age of onset.   Both the AAMR/AAIDD definitions require that the significant limitations relating to intellectual and adaptive functioning originate before age 18 years.[326]   The finding that the deficits in intellectual and adaptive functioning originated prior to age 18 years is implicit in the Court findings relative to the first two prongs, but it also demonstrated by the following evidence in particular.

Smith's academic records contain intelligence test scores that support intellectual impairment prior to age 18 years or close to that time, and are replete with subaverage scores, grades and academic performance.  Such records of poor academic performance are the kind of information upon which the finding as to age

---

[326]AAMR 10TH EDITION at 1; AAIDD 11TH EDITION at 1; DSM-IV-TR at 49.

of onset was based in *Wiley,* 625 F.3d at 221.  Smith's score of 69 on an Otis Beta

test in the 7th grade and his 10th grade Otis Gamma test score of 75 are particularly

relevant.   The same academic records also support the requisite age of onset with

regard to adaptive functioning.  In addition, the Job Corps and Navy records,

compiled close to the age of 18 years, evidenced consistent intellectual and adaptive

deficits.   The ABAS-II and VABS-II standardized scores from Smith's sisters also

support the finding that Smith's deficits originated before age 18 years.

The Court recognizes that prior to these capital proceedings, Smith had never

been formally diagnosed as mentally retarded.[327]

Dr. Swanson discussed an article by K. Salekin & B.M. Doane, *Malingering*

*Intellectual Disability: The Value of Available Measures and Methods,* APPLIED

NEUROPSYCHOLOGY 105, 111 (Taylor & Francis Group 2009), in which the authors

stated that "[i]t's true that the disorder (mental retardation) can go undetected or

that the deficits in functioning can be misconstrued by professionals as a problem

solely due to poverty, lack of access to education, limited intellectual stimulation,

and/or problems in conduct."[328]   Dr. Swanson agreed, pointing out that Smith came

from a low socioeconomic area, and attended a school with problems and no special

education program.[329]

---

[327]Rec. Doc. 1583 at 252.

[328]Govt. Art. 3; Rec. Doc. 1584 at 393.

[329]Rec. Doc. 1584 at 393-94.

The Court also finds that Smith has established by a preponderance of the evidence that he was a person with Mild Mental Retardation prior to the age of 18, at the time of the offense, and at the time of the most current psychological evaluations, consistent with the opinion of Dr. Swanson.

## III.   CONCLUSION

For the foregoing reasons, the Court concludes that the evidence establishes by more than a preponderance of the evidence that at all relevant times, Joseph Smith was mentally retarded as defined by the AAMR/AAIDD and the APA.

Accordingly,

IT IS ORDERED that a sentence of death may not be imposed as to Joseph Smith.   A trial date shall be set.

New Orleans, Louisiana, this 23rd day of June, 2011.

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE

# APPENDIX A

*Additional Findings re: Dr. Swanson's Adaptive Behavior Assessment*

1.   In her report, Dr. Hayes stated that the family members reported that Smith was "unable" at age 17 "to place local telephone calls, dress himself, operate small electrical appliances, order a meal at a restaurant, and cut his own meat."[330] That is simply not true.

a. Placing telephone calls -  Dora, Nell and Patricia all gave Smith the highest rating ("Usually") to "Makes telephone calls to others, using standard or cellphone" on the VABS-II.[331]  On the ABAS-II, both Nell and Patricia answered "Sometimes When Needed" to the question of whether Smith "Places local telephone calls" with Nell also circling "Never When Needed" but still not circling "Is Not Able,"[332] and both answered "Sometimes When Needed" to the question of whether Smith "Finds and uses a pay phone."[333]

b.  Dressing himself -   Dora, Nell and Patricia all answered "Usually" to the specific questions of whether Smith correctly buttoned his clothes and connected zippers on jackets,[334] and "Sometimes" on the VABS-II to the question of whether

---

[330]Govt. Exh. 42 at 20.

[331]Deft. Exh. 1B at 38, 68, 110 (Item 24).

[332]*Id*. at 89, 132 (Item 8).

[333]*Id*. at 90, 133 (Item 12).

[334]*Id*. at 36, 66, 108  (Items 28 & 29)

117

Smith wore appropriate clothing during wet or cold weather.[335]  On the ABAS-II, Nell scored him the highest rank ("Always When Needed") to the question of whether Smith "Dresses himself" and also the highest rating on "Puts shoes on correct feet" and "Buttons his own clothing."[336]  Patricia scored him as "Never When Needed" for "Dresses himself" (but not "Is Not Able") and "Sometimes When Needed" on putting his shoes on the correct feet and buttoning his own clothing.[337]

    c.  <u>Operate small appliances</u> - Dora, Nell and Patricia all gave Smith the highest score ("Usually") on the VABS-II for "Use simple appliances."[338]  They each gave him a "Sometimes" on using a microwave for heating, baking or cooking.[339]  Dora and Patricia gave him the highest rank of "Usually" for using a stove for heating, baking or cooking, while Nell said "Sometimes."[340]  On the ABAS-II, Nell marked "Always When Needed" for "Uses small electrical appliances, for example, a can opener or blender" and Patricia marked "Never When Needed" but not "Is Not Able."[341]  Both Nell and Patricia marked

_____

[335]*Id.* (Item 31).

[336]*Id.* at 93 (Items 4, 1 & 3 of Self Care).

[337]*Id.* at 135a (Items 4, 1 & 3).

[338]*Id.* at 37, 67, 109 (Item 9).

[339]*Id.* (Item 10).

[340]*Id.* (Item 20).

[341]*Id.* at 91, 134 (Item 2 of Home Living).

"Sometimes When Needed" for "Operates a microwave oven."[342]

d. <u>Order a meal at a restaurant</u> - All three women gave Smith the highest ranking of "Usually" on the VABS-II for "Orders a complete meal in a fast-food restaurant."[343]  On the ABAS-II, Nell marked "Sometimes When Needed" for "Orders his own meals when eating out" and Patricia marked "Never When Needed," but again, not "Is Not Able."[344]

e. <u>Cut his own meat</u> - All three women gave Smith the highest rank of "Usually" on the VABS-II  for "Uses sharp knife to prepare food."[345]   On the ABAS-II, Nell marked "Sometimes When Needed" for "Cuts meats or other foods into bite size pieces" and Patricia marked "Never When Needed" but again, not "Is Not Able."[346]

Dr. Hayes chose to highlight the least favorable answer from each cluster, ignoring all the contrary positive responses, and then arbitrarily downgraded the occasional "Never When Needed" to an "Is Not Able."  This indicates not only a lack of accuracy but also an inappropriate advocacy on the part of an expert who should report the findings objectively.  The Court also finds it disturbing because

---

[342]*Id.* (Item 1 of Home Living).

[343]*Id.* at 39, 69, 111 (Item 25).

[344]*Id.* at 90, 133 (Item 1 of Community Use).

[345]*Id*. at 37, 67, 109 (Item 19).

[346]*Id.* at 94, 136 (Item 19 under Self-Care).

the sweeping remark appeared in her final report, while the evidence to the contrary could only be gleaned by a painstaking analysis of the underlying data, making her misrepresentation all the more misleading.[347]

2.   The government claims that individual responses of the two sisters on the ABAS-II were inconsistent, because on some questions one sibling answered "Always When Needed" and the other sibling "Never When Needed" to the same question.[348]   Out of 239 questions that both of them answered, this happened a total of 7 times, or in less than 3% of all the questions.   This is a remarkably low number considering that two different siblings–one older, one younger–are retrospectively evaluating their brother from their own unique perspectives.   As Dr. Swanson testified, even on those very rare occasions where their answers were "Always When Needed" versus "Never When Needed," the person saying "Never When Needed" was not saying  he *could not*  perform the behavior, but rather the two disagreed on how many reminders or prompts he needed to get it done.[349]

Dr. Hayes and the government likewise referenced similar disparities in

---

[347]Dr. Swanson carefully dissected each of Dr. Hayes' specific contentions on direct examination, as outlined above.   When Dr. Hayes testified later, she modified her position to saying that the family reported Smith was "unable to consistently do certain things," still mis-speaking as to "unable" but adding "consistently" to back away from her statement in her report.   Rec. Doc. 1584 at 412.

[348]Rec. Doc. 1583 at 260-61.

[349]*Id.* at 265-66.

answers on the VABS-II.[350]  Unlike the ABAS-II which is self-administered, Dr.
Swanson actually completed the VABS-II through conversation with the
respondent.   She remembered that Patricia, who was younger than Smith, was
particularly struck by the things that she was able to do but her older brother could
not.  In fact, even though younger, she tutored him in his school work.[351]  The
government was also critical, as inconsistent, when the answers between the
respondents were only a one level difference,  claiming they are describing "a much
different individual."[352]   However, the various rating levels are not abruptly distinct,
but rather are transitional.  On the VABS-II, for instance, Level 0 is "Never"; Level
1 is "Sometimes or Partially," and Level 2 is "Usually."   While Dr. Hayes
conceded that different respondents will not produce the same exact data, she
testified that too many inconsistencies existed in the answers.[353]  The Court does not
agree.  As set forth in the main body of this opinion, the majority of responses on
both the VABS-II and the ABAS-II were identical, and the vast majority of the
remainder just a one level difference.

   3.   Some government claims of inconsistencies resulted from a lack of
understanding of Dr. Swanson's notes on the VABS-II.   For example, after
erroneously stating that Patricia scored Smith a "0" on preparing food that required

---

[350]*Id.* at 266-67; Rec. Doc. 1584 at 414-15, 419-20.

[351]Rec. Doc. 1583 at 267-68.

[352]*Id.* at 263; Rec. Doc. 1584 at 422.

[353]Rec. Doc. 1584 at 415.

mixing (she actually scored a "1"),[354] the prosecution challenged Dr. Swanson's note on the next page that said Smith could make red beans, rice and gumbo.[355]  Dr. Swanson explained that as she interviewed the individuals, she would gather information in general about what Smith was capable of doing throughout his life, in order to find out the best he ever achieved in adulthood, such an eventually being able to make red beans and rice, and that information would be in her notes. However, with regard to any specific questions on the VABS-II, she would ask the respondent to focus on what Smith was capable of doing at age 17, and only use that response for her score.[356]

In another instance, the prosecution criticized Dr. Swanson for allegedly inconsistent answers within Nell's VABS-II.  In answering the question of whether Smith had a best friend, Nell scored a "2" or "Usually" and told Dr. Swanson that Smith's older brother, Alfred, was his best friend.[357]  Dr. Swanson elaborated that Smith idolized Alfred, that he was more than a brother and they went everywhere together.[358]  On another question about whether Smith went places with "friends during the day without adult supervision (for example, to a shopping mall, park, community center, etc.), Nell likewise scored him a "2" for "Usually."  However,

---

[354]Deft. Exh. 1B at 109 (Item 21).

[355]Rec. Doc. 1584 at 292-93.

[356]*Id.* at 293; *see also* Rec. Doc. 1583 at 272-75; 278-79.

[357]Def. Exh. 1B at 70 (Item 20).

[358]Rec. Doc. 1584 at 300.

on the question of whether he met with friends regularly, Nell scored a "0" for "Never," noting that he did not have "real friends."[359]   In the context of the questions, and with the aid of Dr. Swanson's notes, the Court does not find an inconsistency.   Clearly, according to Nell, Smith did not have real friends other than his devotion to his best friend, his brother Alfred, so there were no "friends" to meet with regularly.  Clearly, also, she felt at age 17, he was capable of going to a shopping mall or a park with others "without adult supervision."[360]

4.    Another government criticism was that some individual answers were simply implausible.   For example, Patricia answered "Never" to the ABAS-II question whether Smith tied his own shoes.[361]  The prosecutor interpreted that to mean that he knew how to do it, but just "sat there and made somebody else do it." Dr. Swanson pointed out that it did not necessarily mean that, but that it could mean he simply walked around without bothering to tie his shoes or that he tucked the laces into his shoes.[362]  Dr. Hayes particularly singled out Patricia's answers as implausible,  and concluded she was trying to help her brother by presumably exaggerating his deficits.[363]   For instance, she cited Patricia's response of "Never When Needed" to the ABAS-II question whether Smith could name twenty or more

---

[359]Deft. Exh. 1B at 71 (Item 29).

[360]*See also* Rec. Doc. 1584 at 300-01.

[361]Deft. Exh. 1B at 135a (Item 8 of Self-Care).

[362]Rec. Doc. 1583 at 262-63.

[363]Rec. Doc. 1584 at 422-423.

familiar objects.[364]  Having observed in the taped interview the difficulty Smith had

as a man in his 50's had in answering even single questions,  Patricia's observation

from a far earlier developmental period is not surprising to the Court.   Dr. Hayes

interpreted the answer as meaning Patricia thought Smith had fewer than twenty

words in his vocabulary.   This Court construes the answer as Patricia's recognition

that Smith needs considerably prompting before he could name, out of his head,  20

or more objects on his own.   At another point, the prosecutor made a sweeping

statement regarding what Smith "can't" do, according to his family members,

declaring that "you literally would have to push (him) around in a chair..."   Dr.

Swanson reminded him that none of the respondents ever said he "can't" do any

behavior, the distinction was in how many times he had to be reminded or prompted

to do it.[365]

5.   Dr. Hayes and the government also tried to show inconsistencies by

making  inappropriate comparisons between the VABS-II  and ABAS-II scores and

how Smith performed past the age of 17 as an adult, completely ignoring the

difference in ages.  An important aspect of diagnosing mental retardation is

determining when a skill is learned, and how long it takes for the person to finally

master it.[366]   For example, Dora and Patricia answered "Never" to the VABS-II

---

[364]*Id.* at 422.

[365]Rec. Doc. 1583 at 269.

[366]Rec. Doc. 1530, tab 2 at 624, 667; Rec. Doc. 1536.

question whether Smith, at age 17, "Seeks medical care in an emergency."[367]  Dr. Hayes then sought to undermine those answers by comparing it to an emergency room admission sought by Smith in 2000, some thirty-two years later.[368]   That is comparing apples with oranges.  The government tried to undermine a score of "Never" VABS-II answers that Patricia gave Smith for "Edits or corrects own written work before handing it in" with Dr. Swanson's observation that during her evaluation of Smith in 2006, he would often self-correct in order to get a higher score.[369]  Again, Patricia's ranking were based on Smith's capabilities at age 17, and both Dr. Swanson's and Dr. Hayes' interviews were held when Smith was in his 50's.   Similarly, on the ABAS-II, Nell answered "Never When Needed" to "Says irregular plurals nouns," and then the prosecutor cited passages in Dr. Hayes' interview with Smith where he used proper plurals.[370]   Dr. Swanson noted again that the sisters were rating him at age 17 and Dr. Hayes interviewed him in his 50's.[371]   Dr. Hayes conceded that language develops after the age of 17 and vocabularies increase.[372]   As noted earlier, the mildly mentally retarded were previously described as "educable" which indicates that improvement in adaptive

---

[367]Deft. Exh. 1B at 36, 108 (Item 38).

[368]Rec. Doc. 1584 at 420.

[369]Deft. Exh. 1B at 106; Rec. Doc. 1584 at 306.

[370]Deft. Exh. 1B at 89.

[371]Rec. Doc. 1583 at 276.

[372]Rec. Doc. 1585 at 570.

behavior can well be expected.   It is completely inappropriate to use later learned skills to contradict the reliability of scores based on earlier capabilities.

6.   The government also contended that some of Smith's behaviors were the result of cultural norms rather than diminished capacity to perform, citing how in some households, the men never wash, clean, cook or pick up after themselves.  Dr. Swanson acknowledged that in the Smith home growing up, the women did those tasks, but pointed out the question asks only if the person can do it, and if so, does he need prompting or reminders to do it.[373]  While the Court finds the cultural context to be relevant, it also notes that domestic chores are a very small subset of the VABS-II and ABAS-II.   Additionally, from Nell, Smith received either "Always When Needed" or "Sometimes When Needed" on fifteen of the twenty-three ABAS-II items in the Home Living section that covered those type chores. Patricia gave scores of "Sometimes When Needed" on eleven, and a "Never When Needed" on twelve,[374] indicating that Smith did in fact at times do household chores.

---

[373]Rec. Doc. 1584 at 297-98.

[374]Deft. Exh. 1B at 91-92, 134-35.

**APPENDIX B**

*Additional Examples re: Dr. Hayes Interview*

The Court notes the following additional examples of interview answers from Smith that should have been addressed by Dr. Hayes:

1.   When Smith was asked about tattoos on the video, he identified several that he has, but then paused when describing where one of them was, apparently searching for the word "arm."[375]

2.   When he was asked if he was "close to, real close to" anyone besides his mother growing up, like a grandparent, he mentioned his grandmother on his father's side.   He then stated that she died when he was three or four years old and he did not really remember her.   He obviously was not close to her.[376]

3.   When Smith disclosed that his sister was arrested for forgery, Dr. Hayes properly asked him what he meant by that term.   Smith then inaccurately described forgery as "bouncing checks, writing checks that was insufficient and she couldn't cover."[377]

4.   When Smith was asked to spell his sister Patricia's name, he said he did not know.   Dr. Hayes then spelled it for him.[378]

---

[375]Deft. Exh. 5 at 6.

[376]*Id.* at 20.

[377]*Id.* at 31; *see also id.* at 33.

[378]*Id.* at 34.

5.   When Dr. Hayes asked him about the medical history of his mother's side of the family,  Smith told her that his grandfather had "mental problems" and he was sent to "Jackson" where[379] he died, presumably referring to East Feliciana State Hospital, a mental hospital in Jackson, Louisiana.   Dr. Hayes then asked him "what about any psychiatric or mental health difficulties on either side of your family," then lists another string of mental health conditions, such as depression, anxiety, bad nerves, schizophrenia, and anybody trying to commit suicide.   She apparently had not heard what he had just said about his grandfather.   Smith then inexplicably answered  "No, not that I'm aware of."[380]   Dr. Hayes and Dr. Thompson should have realized Smith had just contradicted himself and they should have at least sought clarification.   What the Court surmises is that in the string of mental health conditions Dr. Hayes listed, Smith probably only registered the last one–suicide attempts–and was answering that specific question only.

6.   Dr. Hayes asked Smith to think back on his childhood and tell her what kinds of things he was interested in or liked to do.  Nearly a full 30 seconds passed as Smith obviously struggled to remember.  Then Dr. Hayes prompted him by asking him about riding a bike or hanging out with friends.   With that prompting,

---

[379]In the transcript, the word  "where" is erroneously recorded as "why." "Where" is what Smith actually said on the recording.  *Id.* at 40, disc 2 at 2 minutes.

[380]*Id.* at 40-41.

he remembered playing street ball.[381]

7.   After Smith told Dr. Hayes about a best friend from his childhood named Stanley, Dr. Hayes asked him if he had any best friends after that.   Smith had to think for nearly 30 seconds before coming up with another name.[382]

8.   Dr. Hayes asked Smith who was closest to him now.  Smith asked if she meant a friend and she said friend or family member.  He hesitated and then asked "outside my moms?"   She said sure but he continued to pause.   Dr. Hayes then asked him, "Who knows you better than anybody else, who would you confide in?" Smith still did not understand the question, and asked,   "You mean, for my sisters and brothers, outside my mother?"   She told him, "Really, anyone."   And then he finally said his mother, and after his mother, his brother Alfred.[383]

9.   Dr. Hayes asked Smith when he moved back to New Orleans, how long did he stay there.  A full 30 seconds passed with Smith unable to answer.  She then changed the subject to what jobs he had.[384]

10.   When talking about his childhood schooling, Smith told Dr. Hayes that he had trouble in school, that he was "always slow about comprehending," and

---

[381]*Id.* at 45.

[382]*Id.* at 52.

[383]*Id.* at 52-53.

[384]*Id.* at 76.

needed extra help, particularly with reading, spelling and math.[385]   Dr. Hayes did not probe any of these deficiencies in any more detail.  This was relevant to the adaptive behavior subdomain of Functional Academics.

11.   Smith told Dr. Hayes about a work incident where he fell off a ladder and badly injured his wrist.   He went to a hospital where a cast was put on his hand.   Dr. Hayes asked him if he had to do physical therapy and Smith told her he did not finish the therapy and furthermore, removed the cast himself after a period of time.[386]   This failure to heed medical advice was relevant to both the Daily Living Skills and the Health and Safety subdomains of adaptive behavior.

12.   In connection with the same accident, Dr. Hayes asked Smith if he filed a workers' compensation claim.   Smith said no, and that he was tricked out of doing so by his employer.  Acquiescence and gullibility are characteristics of the mildly mentally retarded.[387]

13.   Smith told Dr. Hayes that when he went to apply to work at the Brown & Root Shipyard as a welder, he failed the welding construction test three times before finally passing.  This was after he had been in welding training programs in the Job Corps, in the U.S. Navy, in prison and in community college, and after purportedly working for a year as a welder.   This was relevant to the Work

---

[385]*Id.* at 84-87.

[386]*Id.* at 111-12.

[387]AAIDD 11TH EDITION at 51-52.

subdomain of the adaptive behavior assessment.[388]

14.   Dr. Hayes questioned Smith about drug treatment.   He said he went to a program once at Bridge House in New Orleans but he did not complete the treatment.  This failure to complete treatment was relevant to the both the Daily Living Skills and the Health and Safety subdomains of the adaptive behavior assessment.

---

[388]Deft. Exh. 5 at 124-26.

**APPENDIX C**

*Additional Findings re: Dr. Hayes' Adaptive Behavior Assessment*

The following are most of the adaptive behaviors listed in Dr. Hayes' expert report which she contends supports a finding that Joseph Smith is not mentally retarded. The few that are not listed are discussed independently in other parts of this opinion. Furthermore, during her trial testimony, Dr. Hayes cited numerous additional examples under the various subdomains.[389] The Court has reviewed those additional examples and found them all to be within the capacity of a person with Mild Mental Retardation.

Those items that the Court has concluded are within the capacity of a person with Mild Mental Retardation are noted with an "A."

Those items that the Court has concluded are within the capacity of a person with Mild Mental Retardation who has been provided structural support are noted with a "B."

Those items which the Court has concluded are beyond the competence of the correctional officers to assess are noted with a "C."

For the reasons stated in the text of this opinion these items are irrelevant to the consideration of whether Joseph Smith is a person with Mild Mental Retardation.

---

[389]Rec. Doc. 1584 at 457-88.

## COMMUNICATION[390]

C          All correctional officers noted Mr. Smith's communication skills were
           within normal limits;

A,B        Mr. Smith wrote multiple requests for attention to his health care
           needs, and while those had grammatical and spelling errors, they were
           successful at communicating his needs, indicating he was successful at
           written communication despite his written language limitations;

A,B        Mr. Smith followed up on unmet health care requests, providing
           approximate dates for when the prior request was issued;

A          Mr. Smith discussed his legal expectations with a former cellmate;

A          Mr. Smith was overheard by correctional officers discussing a topic of
           interest (i.e. women) with another inmate;

A          Mr. Smith conversed with a correctional officer about sports;

A          Mr. Smith is noted to converse with other inmates;

A          Mr. Smith informed the examiners of his favored activities and relayed
           stories from his past; and

A,B[391]   Mr. Smith accurately completely [sic] a grievance report related to a
           deputy handcuffing him too tightly.

## COMMUNITY USE[392]

---

[390]Govt. Exh. 42 at 28; *see also* Rec. Doc. 1584 at 457-62.

[391]Gov. Exh. 42 at 29

[392]*See also* Rec. Doc. 1584 at 462-63.

A,B      Mr. Smith signed up for and went to the law library at the St. Charles Parish Jail;

A      Mr. Smith could certainly walk or ride a bike to locations within a one mile radius;

A,B      Mr. Smith reviews available items for purchase from the commissary, indicates what items he would like to purchase on the commissary request form appropriately, and inventories the items when they are delivered to him. He has questioned the correctional officer responsible for the commissary about being shorted on his orders;

A,B      Mr. Smith diligently reviews his commissary account balance and budgets his money accordingly;

A,B      Mr. Smith can call a doctor when needed;

A      Mr. Smith was noted to use the telephone to place collect telephone calls while incarcerated. Additionally, employment applications list a home telephone number, and legal records indicated following an arrest, he placed his "one telephone call."

C[393]      Correctional officers noted Mr. Smith's community use was within normal limits;

A      During the clinical interview, Mr. Smith relayed the locations of several establishments, including the streets where they are located and possibly the cross streets and/or nearby landmarks;

A      Mr. Smith had a valid Ohio's driver's license, which required his answering 30 of 40 questions correctly;

A      Mr. Smith carried identification in the past as evidenced by copies of identification and social security cards in various employment files; and

---

[393]Govt. Exh. 42 at 30.

A,B   Mr. Smith buys stamps from the commissary to mail letters he has written to family members.

## FUNCTIONAL ACADEMICS[394]

A   Mr. Smith can write his first name and last name, address including zip code, telephone number, and prior employers' contact information as evidenced by several employment applications;

A,B   Mr. Smith can read the commissary menu and complete the commissary request form appropriately;

C[395]   Correctional officers noted Mr. Smith's functional academics were within normal limits;

A,B   Correctional officers noted Mr. Smith reads and obeys signs;

A   Employment records indicated Mr. Smith could follow a daily work schedule, though at times he did not show up for work and did not call his employer to indicate the same;

A,B   Mr. Smith follows the jail schedule without complaint;

A   Mr. Smith has a daily workout routine;

A   John Grisham was noted to be Mr. Smith's favorite author with his favorite book being *Runaway Jury*; he is often observed by correctional officers to be reading in his cell;

A   Mr. Smith plays dominos and cards with other inmates and goes to the law library;

---

[394]*See* Rec. Doc. 1584 at 463-66.

[395]*Id.* at 31.

A         Mr. Smith writes letters to family members;

A,B       Although Mr. Smith currently budgets his commissary account
          appropriately, family members indicated he never had a checking
          account, and when he had a savings account, he took all the money out
          quite quickly; and

A         As part of his employment with several agencies, Mr. Smith was
          required to complete several forms including W4's, Employment
          Eligibility Verifications and other agreements and acknowledgment
          forms.

HOME LIVING[396]

C[397]     Correctional officers noted Mr. Smith's home living was within normal
          limits;

A         Mr. Smith correctly described to the current examiners how to clean a
          bathtub, cook smothered chicken and make a roux, though he indicated
          "kitchen bouquet" was often used now to color gravies;

A         Mr. Smith had a tool box in the past;

A         Correctional officers have observed Mr. Smith cleaning his cell with
          paper towels and napkins, as well as washing his cup out; and

A         Correctional officers noted Mr. Smith makes his bed daily and puts
          things away when he is finished using them.

HEALTH AND SAFETY[398]

---

[396]*See id.* at 466-67.

[397]*Id.* at 32.

[398]*See id.* at 467-69.

A          With the exception of one employment record that indicated Mr. Smith did not clean his work area before leaving, no other safety concerns were noted in any of the employment files reviewed;

A[399]     Working as a welder is such that one would have to follow safety rules as one works around extremely dangerous objects;

C          Correctional officers noted Mr. Smith's health and safety were within normal limits;

A,B        Mr. Smith's correctional records are replete with instances of his requesting medications, providing his medical history, etc.

           (The specific instances are not recorded here but can be found at Govt. Exh. 42 at 33-40); and

A[400]     A correctional officer has observed Mr. Smith swallow his medications routinely.

LEISURE[401]

A,C[402]   Correctional officers noticed Mr. Smith's leisure skills were

           within normal limits.  They have observed him reading, working out, listening to his Walkman, playing cards with other inmates and playing dominos.   They have also observed him conversing with other inmates and guards, and he watches television;

A          Mr. Smith endorsed enjoying reading books, staying fit, writing to family members, and playing basketball;

---

[399]*Id.* at 33.

[400]*Id.* at 40.

[401]*Id.* at 40; *see also id.* at 469-71.

[402]*Id.* at 41.

A          Mr. Smith described having best friends as a youth and has maintained acquaintances for many years; and

A          Legal records indicated Mr. Smith was associating with friends when a crime occurred (bodily injury conviction in Texas in 1996).

SELF-CARE[403]

A          Correctional officer noted all of the above skills were within normal limits.  They indicated if an inmate has a problem with hygiene, other inmates will quickly tell them.   Furthermore, they described that Mr. Smith was quite neat;

A          The examiners noted Mr. Smith to be well groomed, displaying good personal hygiene;

A,B       Mr. Smith completes requests for haircuts and his commissary account reflects purchases of toothpaste, lotion, soap, aftershave, batteries, stamps; and

A          Mr. Smith diligently works out daily, walking around the pod and doing multiple repetitions of resistance exercises.

SELF-DIRECTION[404]

C          Correctional officers noted Mr. Smith's self-direction was within normal limits;

---

[403]*See also id.* at 471-72.

[404]Govt. Exh. 42 at 42; *see also* Rec. Doc. 1584 at 472-75.   In her testimony, Dr. Hayes cited the fact that Smith was aware that taxes were charged on his commissary account and that people file income taxes at the end of the year.  Rec. Doc. 1584 at 474.  Considering Smith's long history of multiple jobs, the Court finds this knowledge to be within his realm of understanding, even if mildly mentally retarded.

A    Marshals indicated Mr. Smith is quite vigilant;

A    Prior to his incarceration, Mr. Smith certainly went out alone in the daytime;

A,B   Correctional officers noted that when requested to do so, he stops whatever activity he is doing and goes to his cell without displaying any anger or untoward behavior;

A    Mr. Smith was noted by a correctional officer to tell a lie in an attempt to get what he wanted;

A,B   Mr. Smith independently chooses his commissary items;

A    Mr. Smith had the capacity to arrive at work in a timely fashion;

A    One employment record indicated Mr. Smith's employment was terminated for insubordination; and

A    Records indicate Mr. Smith chooses an activity and plans accordingly.

### SOCIAL[405]

C[406]   Correctional officers noted Mr. Smith's social skills were within normal limits, with his being polite to them and other inmates;

A    During the current evaluation, Mr. Smith was judged to be polite and friendly;

A    Mr. Smith presumably has good relationships with his family members, including his mother, sisters, brother and cousin;

---

[405]*See* Rec. Doc. 1584 at 475-77.

[406]*Id.* at 43.

A          Mr. Smith does not show good judgment in his selection of friends and/or acquaintances. For example, Mr. Smith was noted to be with John Johnson during a 1974 armed robbery and during the index crime; and

A,B        Jail incident reports indicated Mr. Smith can recognize others emotions and act accordingly (i.e. back off when another individual stands up to him).

WORK[407]

A          (Mr. Smith's work history is summarized with his various job skills detailed. Separately, in this opinion, the Court has concluded that his work history is consistent for a person with Mild Mental Retardation; including his skills as a "tacker");

A[408]      Employment records indicate Mr. Smith did not show up to work at times and was fired. He was also fired once for insubordination. Another write-up related to his not cleaning up his work space;

A          Nevertheless, Mr. Smith had the capacity to attend work regularly (when not using drugs);

A          No safety concerns were indicated in the employment records reviewed; and

A          At one point, Mr. Smith earned approximately $14.00 in regular pay and $19.50 per hour in overtime pay.

---

[407]*See id.* at 477-88.

[408]*Id.* at 44.